## CLEAVINGER ET AL. *v.* SAXNER ET AL.

No. 84–732.   Argued October 16, 1985—Decided December 10, 1985

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, POWELL, STEVENS, and O'CONNOR, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and WHITE, J., joined, *post*, p. 208.

*Deputy Solicitor General Geller* argued the cause for petitioners.   With him on the brief were *Solicitor General Lee, Assistant Attorney General Trott, Samuel A. Alito, Jr.,* and *Gloria C. Phares.*

*G. Flint Taylor* argued the cause for respondents.   With him on the brief was *Charles W. Hoffman.*\*

---

\**John K. Van de Kamp*, Attorney General of California, *Steve White*, Chief Assistant Attorney General, *Arnold O. Overoye*, Assistant Attorney

JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the issue whether members of a federal prison's Institution Discipline Committee, who hear cases in which inmates are charged with rules infractions, are entitled to absolute, as distinguished from qualified, immunity from personal damages liability for actions violative of the United States Constitution.

I

Respondents David Saxner and Alfred Cain, Jr., in January 1975 were inmates at the Federal Correctional Institution at Terre Haute, Ind. They were serving 4- and 5-year sentences, respectively, and each was within 18 months of a possible release date. Each was soon to appear before the parole board. The prison-conduct record of each was good.

On January 6, 1975, William Lowe, a Negro inmate at Terre Haute died in the prison hospital. He was the first of four Negro inmates to die there within the ensuing 7-month period. A work stoppage to protest Lowe's death took place at the prison on January 7 and 8. Respondent Saxner, a white inmate who had served as a "jailhouse lawyer," and respondent Cain, a Negro inmate who was the librarian for the African and New World Cultural Society, assert that neither of them participated in the stoppage. See Brief for Respondents 1. Each, however, was active in gathering information about Lowe's death and about conditions at the prison hospital, and in passing that information to the press, Members of Congress, prison officials, and Saxner's attor-

General, *William George Prahl,* Supervising Deputy Attorney General, *Susan J. Orton,* Deputy Attorney General, *Charles A. Graddick,* Attorney General of Alabama, *Michael A. Lilly,* Attorney General of Hawaii, and *A. G. McClintock,* Attorney General of Wyoming, filed a brief for the State of California et al. as *amici curiae* urging reversal.

*Stephen M. Latimer* filed a brief for Prisoners' Legal Services of New York, Inc., et al. as *amici curiae* urging affirmance.

ney.[1]  On February 14, respondents were cited in separate Incident Reports for encouraging other inmates to engage in work stoppage.  App. 50, 52.  Each was immediately placed in administrative segregation, that is, removed from the general inmate population, and assigned to a separate cell in an unused part of the hospital.  See 28 CFR § 541.20(b) (1985).

On the following day, each respondent was given a copy of the Bureau of Prisons Policy Statement 7400.5c (subject: Inmate Discipline) (Oct. 4, 1974).  See App. 25–49.  Saxner signed a written notice which explained his rights at a hearing to be held before an Institution Discipline Committee. Among these were the right to have a written copy of the charge; the right to have a member of the prison staff represent him; the rights, except where institutional safety would be jeopardized, to be present at the hearing, to call witnesses, and to submit documentary evidence; and the right to receive a written explanation of the committee's decision. Id., at 54.[2]  Although the record does not so disclose, we assume that respondent Cain received a similar notice at that time.

Respondents were brought before the Institution Discipline Committee on February 21.  The committee was composed of petitioners Theodore Cleavinger, Associate Warden, as chairman; Marvin Marcadis, correctional supervisor; and Tom P. Lockett, chief of case management.[3]

---

[1] This activity apparently resulted in a visit to the Terre Haute facility by an Assistant Surgeon General and in a lawsuit concerning the last of the four hospital deaths.  See *Green* v. *Carlson*, 581 F. 2d 669 (CA7 1978), aff'd, 446 U. S. 14 (1980).

[2] The Policy Statement did not provide for cross-examination, representation by a lawyer, verbatim record of the proceeding, or nonagency or judicial review.  Neither did it specify the standard of proof or the standard of punishment.

[3] The Solicitor General advises us, see Brief for Petitioners 3, n. 4, that a committee of this kind at the Terre Haute facility usually was composed of three members.  By regulation, the chairman and one other member must be of department-head level, or higher.  See 28 CFR § 541.16(b)

Respondent Saxner was accompanied at the hearing by Ralph Smith, staff counselor, whom Saxner had selected to represent him. After reading the charge and reviewing Saxner's rights, the committee introduced Saxner's Incident Report and three documents found in his cell. These were, respectively, a "press release" Saxner had sent to 50 newspapers; a four-page document which detailed interviews with inmates about their medical treatment at the prison hospital; and a letter from Saxner to an American Civil Liberties Union lawyer, Saunders, which enclosed the other two documents and which discussed medical conditions, possible litigation on behalf of the Lowe family and other inmates, communications with the press, and the obtaining of local counsel. The press release, among other things, advocated administrative approval of a prisoners' union and amnesty for those who had participated in the work stoppage. *Id.*, at 81. Neither the investigating officer nor the charging officer nor any guard was called as a witness. Saxner, however, testified and introduced affidavits of several inmates. His request that he be permitted to call inmates to confirm that he did not encourage any work stoppage was denied on the ground that such testimony would be cumulative. While admitting that he had written the press release and had mailed it to persons outside the prison without authorization, Saxner asserted his innocence on the specific charge referred. *Id.*, at 60, 71.

The committee found respondent Saxner guilty of encouraging a work stoppage. Also, although not specifically so charged, he was found guilty of unauthorized use of the mail and of possession of contraband, that is, material advocating an illegal prisoners' union. The committee ordered that

(1985). The reporting officer, investigating officer, and any person who was a witness to the incident or played a significant part in having the charge referred, may not be a member of the committee except "where virtually every staff member in the institution witnessed the incident in whole or in part." *Ibid.*

Saxner be placed in administrative detention and forfeit 84 days of "good time." His transfer to another institution was recommended. *Id.*, at 57.

Respondent Cain's hearing took place the same day before the same committee and immediately prior to Saxner's hearing. *Id.*, at 64. He was accompanied by J. R. Alvarado, a staff representative. He was advised of his rights. His Incident Report was produced. Two documents found in his cell (Saxner's letter to Saunders and a manuscript concerning "Ideals and Proposals of the Prisoner Labor Union") were introduced. Cain testified and denied that he had encouraged inmates not to work. He requested the right to cross-examine his accusers, but no other witness was called.

At the conclusion of Cain's hearing, the committee found him guilty of encouraging a work stoppage and, although not specifically so charged, of possessing contraband, that is, "inflammatory material . . . supporting disruptive conduct in the institution." *Id.*, at 65. The committee ordered that Cain be placed in administrative detention and forfeit 96 days of "good time." His transfer to another institution also was recommended. *Ibid.*

Respondents appealed to the Warden of the institution. The Warden ordered their release from administrative detention, restored the good time, and directed that each respondent's record carry a notation that "the incident not reflect unfavorably" upon consideration for parole. *Id.*, at 74, 77. The Warden refused, however, to expunge respondents' records. *Ibid.* Saxner and Cain were released into the general prison population on March 21.

Respondents next appealed to the Regional Director of the Bureau of Prisons. The Regional Director ruled that the disciplinary report, the action by the committee on the incident, and material relevant thereto were to be expunged from each respondent's record. *Id.*, at 79, 80. Thus, in the end, after these appeals, respondents obtained all the administrative relief they sought. But in the meantime, for a

definite interval, each had been condemned (improperly as it turned out) to "administrative detention."

Respondent Saxner was paroled and released in April 1975. Respondent Cain was granted parole in June and released in December.

Meanwhile, in March 1975, respondents brought suit in the United States District Court for the Southern District of Indiana against petitioners, the Terre Haute Warden, and the institution's administrative supervisor. Their third amended complaint alleged that the defendants had violated their rights under the First, Fourth, Fifth, Sixth, and Eighth Amendments. *Id.*, at 12. See *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971). Respondents sought declaratory and injunctive relief and compensatory damages. App. 22.

The District Court granted petitioners' motion to dismiss the complaint on the ground that their functioning as hearing officers entitled them to absolute immunity. Nearly two years later, however, in April 1981, the District Court, on reconsideration, reinstated the suit in light of its controlling court's decision in *Mary* v. *Ramsden*, 635 F. 2d 590 (CA7 1980), where the Court of Appeals held that members of a disciplinary committee at a Wisconsin juvenile facility were entitled to only qualified immunity. App. 23.

The case then was tried to a jury. In response to special interrogatories, the jury found that petitioners had violated respondents' Fifth Amendment due process rights.[4] The jury awarded each respondent $1,500 compensatory damages against each petitioner, or a total of $4,500; each petitioner was thus subjected to liability totaling $3,000. *Id.*, at 9.

Petitioners' subsequent motion for judgment notwithstanding the verdict was denied. They appealed, contending,

---

[4] Judgment was entered in favor of the defendant Warden and the defendant administrative supervisor. Respondents did not contest this aspect of the judgment on appeal.

among other things, that, as members of the discipline committee, they were entitled to absolute immunity.[5]

The United States Court of Appeals for the Seventh Circuit, by a divided vote, affirmed. *Saxner* v. *Benson*, 727 F. 2d 669 (1984). It held that petitioners' claim for absolute immunity was foreclosed by Seventh Circuit precedent denying such immunity to state correctional officers serving in a similar capacity. *Id.*, at 670. See *Redding* v. *Fairman*, 717 F. 2d 1105, 1117 (1983), cert. denied, 465 U. S. 1025 (1984); *Chavis* v. *Rowe*, 643 F. 2d 1281, 1288, cert. denied *sub nom. Boles* v. *Chavis*, 454 U. S. 907 (1981); *Mary* v. *Ramsden*, 635 F. 2d, at 600. Petitioners' request for rehearing en banc was denied by a vote of 5 to 4. App. to Pet. for Cert. 36a.

Because of the importance of the issue, and because the Seventh Circuit rulings, although consistent with *Jihaad* v. *O'Brien*, 645 F. 2d 556, 561 (CA6 1981), were claimed to be in some conflict with the en banc decision of the Fourth Circuit in *Ward* v. *Johnson*, 690 F. 2d 1098 (1982), we granted certiorari. 469 U. S. 1206 (1985).

## II

A. This Court has observed: "Few doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction." *Pierson* v. *Ray*, 386 U. S. 547, 553–554 (1967). The Court specifically has pronounced and followed this doctrine of the common law for more than a century. In *Bradley* v. *Fisher*, 13 Wall. 335 (1872), it ruled that a federal judge may not be held accountable in damages for a judicial act taken within his court's jurisdiction. Such immunity applies "however erroneous the act may have been, and however injurious in its consequences it may have proved to

---

[5] The sole question raised by petitioners in this Court is whether, as committee members, they were entitled to absolute immunity. Petitioners state that they have not challenged—although they do not concede— the ruling that they violated "clearly established constitutional rights" of respondents. See Brief for Petitioners 7, n. 8.

the plaintiff." *Id.*, at 347. "Nor can this exemption of the judges from civil liability be affected by the motives with which their judicial acts are performed." *Ibid.* In *Pierson* v. *Ray, supra,* the Court held that absolute immunity shielded a municipal judge who was sued for damages under 42 U. S. C. § 1983 by clergymen who alleged that he had convicted them unconstitutionally for a peaceful protest against racial segregation. The Court stressed that such immunity was essential to protect the integrity of the judicial process. 386 U. S., at 554. And in *Stump* v. *Sparkman,* 435 U. S. 349 (1978), the Court once again enunciated this principle, despite any "informality with which [the judge] proceeded," and despite any *ex parte* feature of the proceeding. *Id.*, at 363, and n. 12.

With this judicial immunity firmly established, the Court has extended absolute immunity to certain others who perform functions closely associated with the judicial process. The federal hearing examiner and administrative law judge have been afforded absolute immunity. "There can be little doubt that the role of the modern federal hearing examiner or administrative law judge . . . is 'functionally comparable' to that of a judge." *Butz* v. *Economou,* 438 U. S. 478, 513 (1978). Full immunity also has been given to federal and state prosecutors. *Yaselli* v. *Goff,* 275 U. S. 503 (1927), aff'g 12 F. 2d 396 (CA2 1926); *Imbler* v. *Pachtman,* 424 U. S. 409, 424–426 (1976). The same is true for witnesses, including police officers, who testify in judicial proceedings. Witnesses are "integral parts of the judicial process" and, accordingly, are shielded by absolute immunity. *Briscoe* v. *LaHue,* 460 U. S. 325, 335 (1983). And the Court has noted the adoption in this country of the principle of immunity for grand jurors. See *Imbler* v. *Pachtman,* 424 U. S., at 423, n. 20. See also *Butz* v. *Economou,* 438 U. S., at 509–510.

Although this Court has not decided whether state parole officials enjoy absolute immunity as a matter of federal law, see *Martinez* v. *California,* 444 U. S. 277, 284 (1980), federal

appellate courts have so held. See, *e. g.*, *Sellars* v. *Procunier*, 641 F. 2d 1295, 1303 (CA9), cert. denied, 454 U. S. 1102 (1981); *Evans* v. *Dillahunty*, 711 F. 2d 828, 830–831 (CA8 1983); *United States ex rel. Powell* v. *Irving*, 684 F. 2d 494 (CA7 1982).

B. The Court has extended absolute immunity to the President when damages liability is predicated on his official act. *Nixon* v. *Fitzgerald*, 457 U. S. 731, 744–758 (1982). See *Harlow* v. *Fitzgerald*, 457 U. S. 800, 807 (1982). "For executive officials in general, however, our cases make plain that qualified immunity represents the norm." *Ibid.* See *Scheuer* v. *Rhodes*, 416 U. S. 232 (1974) (State Governor and his aides); *Harlow* v. *Fitzgerald*, *supra* (Presidential aides); *Butz* v. *Economou*, *supra* (Cabinet member, acknowledging, however, that there are "those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business," 438 U. S., at 507); *Procunier* v. *Navarette*, 434 U. S. 555 (1978) (state prison officials); *Wood* v. *Strickland*, 420 U. S. 308 (1975) (school board members); *Pierson* v. *Ray*, *supra* (police officers). *Spalding* v. *Vilas*, 161 U. S. 483 (1896) (Postmaster General), and *Barr* v. *Matteo*, 360 U. S. 564 (1959) (Government officials), where full immunity was afforded, both antedated *Bivens*. In any event, "federal officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope." *Butz* v. *Economou*, 438 U. S., at 506; *Harlow* v. *Fitzgerald*, 457 U. S., at 808.

C. The Court has said that "in general our cases have followed a 'functional' approach to immunity law." *Id.*, at 810. "[O]ur cases clearly indicate that immunity analysis rests on functional categories, not on the status of the defendant." *Briscoe* v. *LaHue*, 460 U. S., at 342. Absolute immunity flows not from rank or title or "location within the Government," *Butz* v. *Economou*, 438 U. S., at 511, but from the nature of the responsibilities of the individual official. And

in *Butz* the Court mentioned the following factors, among others, as characteristic of the judicial process and to be considered in determining absolute as contrasted with qualified immunity: (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal. *Id.*, at 512.

### III

We turn to the application of these principles to the facts of the present case. Judge Cudahy of the Court of Appeals, in his separate concurring opinion, 727 F. 2d, at 673, stressed the *Butz* factors and was persuaded by what he felt were the absence of procedural safeguards, the rare and exceptional character of absolute immunity, and the need for such immunity only when public policy requires it. *Id.*, at 674–676.

Petitioners, in response, and seemingly in order to negate the significance of certain of the specified factors, point out that grand jury proceedings possess few procedural safeguards that are associated with court proceedings, and are largely immune from any type of judicial review. See, *e. g.*, *United States* v. *Calandra*, 414 U. S. 338, 345 (1974); *Costello* v. *United States*, 350 U. S. 359 (1956). Petitioners also observe that prosecutorial decisionmaking is not subject to the formalities of trials; instead, the prosecutor exercises broad and generally unreviewable discretion. Yet grand jurors and prosecutors enjoy absolute immunity. Petitioners finally argue that the Court's cases teach that absolute immunity shields an official if (a) the official performs an adjudicatory function comparable to that of a judge, (b) the function is of sufficient public importance, and (c) the proper performance of that function would be subverted if the offi-

cial were subjected to individual suit for damages.   Brief for Petitioners 21.

When we evaluate the claim of immunity for the committee members, we bear in mind that immunity status is for the benefit of the public as well as for the individual concerned.   *Pierson* v. *Ray*, 386 U. S., at 554.   The committee members, in a sense, do perform an adjudicatory function in that they determine whether the accused inmate is guilty or innocent of the charge leveled against him; in that they hear testimony and receive documentary evidence; in that they evaluate credibility and weigh evidence; and in that they render a decision.   We recognize, too, the presence of some societal importance in this dispute-resolution function.   The administration of a prison is a difficult undertaking at best, for it concerns persons many of whom have demonstrated a proclivity for antisocial, criminal, and violent conduct. See *Hudson* v. *Palmer*, 468 U. S. 517, 526–527 (1984).   We also acknowledge that many inmates do not refrain from harassment and intimidation.   The number of nonmeritorious prisoners' cases that come to this Court's notice is evidence of this.   Tension between prison officials and inmates has been described as "unremitting."   *Wolff* v. *McDonnell*, 418 U. S. 539, 562 (1974).   "Retaliation is much more than a theoretical possibility."   *Ibid.*   And we do not underestimate the fact, stressed by petitioners, that committee members usually are persons of modest means and, if they are suable and unprotected, perhaps would be disinclined to serve on a discipline committee.   See *Ward* v. *Johnson*, 690 F. 2d, at 1108.

We conclude, nonetheless, that these concerns, to the extent they are well grounded, are overstated in the context of constitutional violations.   We do not perceive the discipline committee's function as a "classic" adjudicatory one, as petitioners would describe it.   Tr. of Oral Arg. 9–10.   Surely, the members of the committee, unlike a federal or state judge, are not "independent"; to say that they are is to ignore reality.   They are not professional hearing officers, as are

administrative law judges. They are, instead, prison officials, albeit no longer of the rank and file, temporarily diverted from their usual duties. See *Ward* v. *Johnson*, 690 F. 2d, at 1115 (dissenting opinion). They are employees of the Bureau of Prisons and they are the direct subordinates of the warden who reviews their decision. They work with the fellow employee who lodges the charge against the inmate upon whom they sit in judgment. The credibility determination they make often is one between a co-worker and an inmate. They thus are under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee. See *Ponte* v. *Real*, 471 U. S. 491, 513 (1985) (dissenting opinion). It is the old situational problem of the relationship between the keeper and the kept, a relationship that hardly is conducive to a truly adjudicatory performance.

Neither do we equate this discipline committee membership to service upon a traditional parole board. The board is a "neutral and detached" hearing body. *Morrissey* v. *Brewer*, 408 U. S. 471, 489 (1972). The parole board member has been described as an impartial professional serving essentially "'as an arm of the sentencing judge.'" *Sellars* v. *Procunier*, 641 F. 2d., at 1302, n. 15, quoting *Bricker* v. *Michigan Parole Board*, 405 F. Supp. 1340, 1345 (ED Mich. 1975). And in the penalty context, the parole board is constitutionally required to provide greater due process protection than is the institution discipline committee. *Wolff* v. *McDonnell*, 418 U. S., at 561.

We relate this committee membership, instead, to the school board service the Court had under consideration in *Wood* v. *Strickland*, 420 U. S. 308 (1975). The school board members were to function as "adjudicators in the school disciplinary process," and they were to "judge whether there have been violations of school regulations and, if so, the appropriate sanctions for the violations." *Id.*, at 319. Despite the board's adjudicative function of that extent, the Court concluded that the board members were to be protected by

only qualified immunity. After noting the suggestion of the presence of a deterrence-from-service factor, the Court concluded that "absolute immunity would not be justified since it would not sufficiently increase the ability of school officials to exercise their discretion in a forthright manner to warrant the absence of a remedy for students subjected to intentional or otherwise inexcusable deprivations." *Id.*, at 320.

That observation and conclusion are equally applicable here. It is true, of course, that the "prisoner and the schoolchild stand in wholly different circumstances, separated by the harsh facts of criminal conviction and incarceration." *Ingraham* v. *Wright*, 430 U. S. 651, 669 (1977). But in *Ingraham* it was also said that even if schoolchildren and their parents do not have a prisoner's motive or proclivity to institute harassing lawsuits, they have "little need for the protection of the Eighth Amendment," for "the openness of the public school and its supervision by the community afford significant safeguards against the kinds of abuses from which the Eighth Amendment protects the prisoner." *Id.*, at 670. If qualified immunity is sufficient for the schoolroom, it should be more than sufficient for the jailhouse where the door is closed, not open, and where there is little, if any, protection by way of community observation.

Petitioners assert with some vigor that procedural formality is not a prerequisite for absolute immunity. They refer to well-known summary and *ex parte* proceedings, such as the issuance of search warrants and temporary restraining orders, and the setting of bail. And they sound a note of practicality by stating that recasting prison disciplinary tribunals in the mold of formal administrative bodies would be inimical to the needs of prison discipline and security. It is said that committee procedures fully comply with, and indeed exceed, what *Wolff* v. *McDonnell*, *supra*, requires, that they are sufficiently "judicial" to qualify for absolute immunity, and that *Wolff* "would be undone" as a practical matter if absolute immunity were not afforded. Brief for Petitioners 30.

In any event, it is asserted, committee proceedings contain ample safeguards to ensure the avoidance or correction of constitutional errors. Among these are the qualifications for committee service; prior notice to the inmate; representation by a staff member; the right to present certain evidence at the hearing; the right to be present; the requirement for a detailed record; the availability of administrative review at three levels (demonstrated by the relief obtained on review by these respondents at the first two levels); and the availability of ultimate review in federal court under 28 U. S. C. § 2241. Finally, it is said that qualified immunity would provide insufficient protection for committee members.

We are not persuaded. To be sure, the line between absolute immunity and qualified immunity often is not an easy one to perceive and structure. That determination in this case, however, is not difficult, and we readily conclude that these committee members fall on the qualified-immunity side of the line.

Under the Bureau's disciplinary policy in effect at the time of respondents' hearings, few of the procedural safeguards contained in the Administrative Procedure Act under consideration in *Butz* were present. The prisoner was to be afforded neither a lawyer nor an independent nonstaff representative. There was no right to compel the attendance of witnesses or to cross-examine. There was no right to discovery. There was no cognizable burden of proof. No verbatim transcript was afforded. Information presented often was hearsay or self-serving. The committee members were not truly independent. In sum, the members had no identification with the judicial process of the kind and depth that has occasioned absolute immunity.

Qualified immunity, however, is available to these committee members. That, we conclude, is the proper point at which to effect the balance between the opposing considerations. This less-than-absolute protection is not of small consequence. As the Court noted in *Butz*, 438 U. S., at

507–508, insubstantial lawsuits can be recognized and be quickly disposed of, and firm application of the Federal Rules of Civil Procedure "will ensure that federal officials are not harassed by frivolous lawsuits." *Id.*, at 508. All the committee members need to do is to follow the clear and simple constitutional requirements of *Wolff* v. *McDonnell, supra;* they then should have no reason to fear substantial harassment and liability. Qualified immunity has been widely imposed on executive officials who possess greater responsibilities. See, *e. g., Scheuer* v. *Rhodes, Butz* v. *Economou, Harlow* v. *Fitzgerald,* all *supra,* and *Mitchell* v. *Forsyth,* 472 U. S. 511 (1985). "[I]t is not unfair to hold liable the official who knows or should know he is acting outside the law, and . . . insisting on an awareness of clearly established constitutional limits will not unduly interfere with the exercise of official judgment." *Butz* v. *Economou,* 438 U. S., at 506–507. See also *Barr* v. *Matteo,* 360 U. S., at 588–589 (BRENNAN, J., dissenting); *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S., at 411 (Harlan, J., concurring in judgment). See Gray, Private Wrongs of Public Servants, 47 Calif. L. Rev. 303, 339 (1959). Public policy has not dictated otherwise.

It is the business of prison officials, of course, to maintain order within their institutions. But this fact does not support a claim that every step taken to protect constitutional rights of prisoners will lead to a breakdown in institutional discipline and security. Routine and automatic arguments to this effect have been made before and have been rejected by this Court. See *Johnson* v. *Avery,* 393 U. S. 483, 486–487 (1969); *Lee* v. *Washington,* 390 U. S. 333, 334 (1968); *Ex parte Hull,* 312 U. S. 546 (1941).

We likewise are not impressed with the argument that anything less than absolute immunity will result in a flood of litigation and in substantial procedural burdens and expense for committee members. This argument, too, has been made before. But this Court's pronouncements in *Harlow*

v. *Fitzgerald,* 457 U. S., at 813–820, place the argument in appropriate perspective, for many cases may be disposed of without the necessity of pretrial discovery proceedings.  Our experience teaches us that the vast majority of prisoner cases are resolved on the complaint alone.  Of those prisoners whose complaints survive initial dismissal, few attempt discovery and fewer still actually obtain it.  See Turner, When Prisoners Sue: A Study of Prisoner Section 1983 Suits in the Federal Courts, 92 Harv. L. Rev. 610 (1979).  And any expense of litigation largely is alleviated by the fact that a Government official who finds himself as a defendant in litigation of this kind is often represented, as in this case, by Government counsel.  If the problem becomes acute, the Government has alternatives available to it: it might decide to indemnify the defendant official; Congress could make the claim a subject for the Federal Tort Claims Act; and Congress could even consider putting in place administrative law judges to preside at prison committee hearings.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE WHITE join, dissenting.

The Court concludes that the members of the Institution Discipline Committee of a federal prison are more like school board members than they are like administrative law judges or members of a parole board, and that therefore they are not entitled to absolute immunity from liability for damages. Concededly the hearings in which these officials perform their adjudicatory function do not include all of the procedural safeguards or the adherence to written precedent that surround the function of an administrative law judge, but I do not read *Butz* v. *Economou,* 438 U. S. 478 (1978), as making these factors dispositive against a claim for absolute immunity.  I also think that the factors peculiar to the prison

environment counsel in favor of such an immunity for these officials.

Litigation before administrative law judges is generally conducted by lawyers, who are trained to suppress their dislike of, or contempt for, the particular judge before whom they try their case. The lawyers and their clients come from their homes and hotels to a government building in the morning, present their case to the judge, go and have lunch, return in the afternoon, and again present their case. When the court recesses for the day, the parties and their lawyers return to their homes and hotels. At least one side will be disappointed with the ultimate ruling of the judge, but there is little reason to think that they will bear personal animus or hostility toward the judge as a result of his decision.

Inside the prison walls, however, a considerably different atmosphere appears to obtain. A prisoner charged with a serious violation of prison regulations and threatened with administrative detention and loss of good time may have quite different emotions when appearing before the Institution Discipline Committee than does, for example, the plant manager of an employer charged with a violation of the National Labor Relations Act appearing before an administrative law judge. "Prison life, and relations between the inmates themselves and between the inmates and prison officials or staff, contain the ever-present potential for violent confrontation and conflagration." *Jones* v. *North Carolina Prisoners' Labor Union,* 433 U. S. 119, 132 (1977).

Our observations in *Preiser* v. *Rodriguez,* 411 U. S. 475 (1973), about the relationship between a State and its prisoners are equally applicable to the relationship between the Federal Government and its prisoners:

"The relationship of state prisoners and the state officers who supervise their confinement is far more intimate than that of a State and a private citizen. For state prisoners, eating, sleeping, dressing, washing, working, and playing are all done under the watchful eye of the

State, and so the possibilities for litigation under the Fourteenth Amendment are boundless. What for a private citizen would be a dispute with his landlord, with his employer, with his tailor, with his neighbor, or with his banker becomes, for the prisoner, a dispute with the State." *Id.*, at 492.

In *Wolff* v. *McDonnell*, 418 U. S. 539 (1974), our first major decision applying the Due Process Clause of the Fourteenth Amendment to prison disciplinary proceedings, we said:

"Prison disciplinary proceedings . . . take place in a closed, tightly controlled environment peopled by those who have chosen to violate the criminal law and who have been lawfully incarcerated for doing so. Some are first offenders, but many are recidivists who have repeatedly employed illegal and often very violent means to attain their ends. They may have little regard for the safety of others or their property or for the rules designed to provide an orderly and reasonably safe prison life. . . . Guards and inmates co-exist in direct and intimate contact. Tension between them is unremitting. Frustration, resentment, and despair are commonplace. Relationships among the inmates are varied and complex and perhaps subject to the unwritten code that exhorts inmates not to inform on a fellow prisoner." *Id.*, at 561–562.

Not only may emotions run higher and tensions be exacerbated in the prison environment, but prisoners simply are not subject to many of the constraints which often deter members of the population at large from litigating at the drop of a hat. We have held, for example, that prisoners in confinement are entitled to free access to lawbooks or some other legal assistance. *Bounds* v. *Smith*, 430 U. S. 817 (1977). And the great majority of prisoners qualify for *in forma pauperis* status, which entitles them to relief from statutory

filing fees. With less to profitably occupy their time than potential litigants on the outside, and with a justified feeling that they have much to gain and virtually nothing to lose, prisoners appear to be far more prolific litigants than other groups in the population. And prisoners have made increasing use of § 1983 and *Bivens*-type suits in recent years: 18,856 such suits were filed in federal court in the year ending June 30, 1984, as compared to just 6,606 in 1975. Administrative Office of the United States Courts, Annual Report of the Director 143, Table 24 (1984).

In light of the foregoing, I think a slightly different balancing of the ledger is called for in the case of prison disciplinary officials than in the case of administrative law judges. The latter are surrounded by greater procedural protections for the litigants, and are governed by precedent. But the former operate in a far more volatile environment, are called upon to make decisions more quickly, and are much more likely to be the object of harassing litigation in the absence of absolute immunity. If in fact the administrative system set up by the government offers administrative relief from these officials' mistakes, and thereby permits the vindication of constitutional claims in this manner, I believe that the grant of absolute immunity meets the conditions set out in *Butz* v. *Economou*, 438 U. S. 478 (1978).

Here we need not look far for the availability or speed of administrative relief. Both respondents appeared before the Institution Discipline Committee on February 21, 1975. A few days later that committee issued its ruling, and respondents appealed to the Warden. On March 21, 1975, the Warden granted most of the relief requested, ordering respondents released from administrative segregation and restoring their forfeited good time. He also directed that their records carry a notation that the incident should not adversely affect their chances for parole. Respondents then appealed to the Regional Director of the Bureau of Prisons, who on April 11, 1975, granted respondents' final request

that all mention of the incident be expunged from their records. The entire administrative proceeding, from the day on which the hearing before the committee was held to the final ruling of the Regional Director granting respondents all of the relief requested, took less than two months.

In *Price* v. *Johnston*, 334 U. S. 266 (1948), we said that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id.*, at 285. It requires no more than a common-sense application of this observation to the general principles laid down in *Butz*, *supra*, to conclude that the members of the Institution Discipline Committee are entitled to absolute immunity from liability for their decisions.

I respectfully dissent.