DANIEL T. MEIS, APPELLANT, MARK PROSSER ET AL., APPELLEES, V. GARY GRAMMER ET AL., APPELLEES.

411 N.W.2d 355

Filed August 28, 1987. No. 87-016.

Daniel T. Meis, pro se.

Robert M. Spire, Attorney General, and Linda L. Willard, for appellees Grammer et al.

BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

CAPORALE, J.

Plaintiff Daniel T. Meis appeals from a declaration by the district court that certain provisions of the challenged portion of a Department of Correctional Services operational memorandum relating to the disbursement of trust funds belonging to inmates at the penitentiary are valid. Meis assigns as error the district court's (1) determination that Neb. Rev. Stat. § 83-183(3) (Reissue 1981) mandates restrictions on the use of inmate wages, (2) "den[ial of] the relief requested," (3) failure to set a time within which the defendants, Warden Gary E. Grammer and various other named and unnamed employees of the penitentiary, are to correct the deficiencies in the portion of the operational memorandum declared to be impermissibly vague and not to be enforced, and (4) failure to find the entire

challenged portion of the operational memorandum to be in violation of Neb. Const. art. I, §§ 1, 15, 16, 25, and 26, and the 14th amendment to the U.S. Constitution. We affirm.

Meis and eight other inmates brought this suit on their own behalf and purportedly on behalf of all other inmates at the penitentiary. However, Meis appealed to this court only in his individual capacity. Thus, we are not concerned with any class action issues which might otherwise have been present. Moreover, as Meis is the sole appellant, we do not concern ourselves with those parts of the record which relate to the claims of the other named plaintiffs.

As part of the Department of Correctional Services, the penitentiary maintains a single trust fund in which all inmate money, from whatever sources, is deposited, disbursed, and accounted for. On December 6, 1979, the penitentiary administration adopted an "official," later to become known as an "operational," memorandum, No. 113.2.112, to provide "a documented accounting for the funds of offenders." The memorandum underwent a number of revisions, and as of October 7, 1985, the date of the most recent amendment, its stated purpose is to "set forth a system for the accounting and handling of funds to be credited to Penitentiary inmates." It states in relevant part:

> As provided by Statute and Agency regulations, inmates may withdraw funds to assist with family support, make purchases in the Canteen and from approved vendors, or for deposit in interest bearing accounts in designated financial institutions. . . .
>
> For the purpose of this Memorandum, "FAMILY" is defined as parent, brother, sister, son, daughter, or spouse. Any exception to this stated list must have the approval of the Warden.

Prior to the October 7, 1985, amendment, the memorandum did not define family and made no provisions for exceptions to the "stated list."

The penitentiary administrators testified that the operational memorandum was necessary for the "safety, security, and good order of the institution," in that it provides a means of controlling the flow of inmate funds and thereby helps control

illegal activities such as gambling, purchasing drugs, and the applying of pressure by one inmate against another. The administrators admitted, however, that although policies as to the transfer of property from one inmate to another exist, it would be possible for an inmate to use canteen purchases as a means of paying off another inmate. An inmate could also deposit funds in an outside financial institution and deal with those funds without being subjected to the restrictions imposed by the memorandum.

Meis testified that on or about October 12, 1985, he requested that $5 be disbursed from his trust funds to pay a debt to a friend and that the request was denied by the penitentiary administration. Although there exists within the Department of Correctional Services an appeal procedure from the denial of disbursements, Meis did not avail himself of it. Defendants, however, raised no issue at trial in this regard. At the time of his request, Meis had approximately $135 in the fund. He had earned approximately $72 of the total while at the penitentiary; the balance came from sources outside the penitentiary through gifts or the payment of money owed him. Meis also testified he had successfully sent $4 to his friend on a prior occasion, but it is not clear when, as he had at one time alleged he had been prevented from using his money as he wished on August 27, 1985. Meis offered no evidence which documents the existence of the debt or which explains why or when it came into existence.

The district court concluded that the challenged portion of the operational memorandum was valid except for the single "sentence which reads 'Any exception to this stated list must have the approval of the Warden.' " The court found that provision to be vague and to therefore deprive the plaintiffs of due process, and thus enjoined the warden

> (a) from granting any exceptions which allow disbursements from the Inmate Trust Fund for family support or assistance to any persons other than those specifically included within the definition of "family", i.e., a parent, brother, sister, son, daughter, or spouse; and
> (b) from granting any exceptions to other portions of Operational Memorandum 113.2.112 dated October 7,

1985.

The court held the remainder of the challenged portion of the memorandum to be valid and enforceable and, accordingly, denied Meis' request that enforcement of the remainder be enjoined as well.

Meis' first assignment claims the district court's finding that § 83-183(3) "mandates certain restrictions on the use of wages earned by the inmates and money which is in the Inmate Trust Fund" is erroneous. No claim is made that § 83-183(3) is itself unconstitutional or that the challenged portion of the memorandum does not comply with the requirements of § 83-183(3); the only claim in connection with this assignment of error is that § 83-183(3) imposes no limitation on the use of inmate funds.

Section 83-183(1) provides for the employment of inmates in the "[Department of Correctional Services] facilities, for state use and for other purposes authorized by law." Section 83-183(3) states:

> Except as provided in section 83-183.01, wage payments to a person committed to the department shall be set aside by the chief executive officer of the facility in a separate fund. The fund shall enable the offender to contribute to the support of his dependents, if any, to make necessary purchases from the commissary, and to set aside sums to be paid to him at the time of his release from the facility.

Neb. Rev. Stat. § 83-183.01 (Cum. Supp. 1986) concerns itself with the treatment of wages earned by inmates paid "at least minimum wage." The evidence does not suggest that Meis earned at least minimum wage; thus, § 83-183.01 has no application. The language of § 83-183(3) does indeed undertake to limit the use of inmate wages to the support of dependents (not "family"), purchases from the commissary, and savings to be paid to the inmate upon release from the penitentiary. The district court's finding that § 83-183(3) mandates certain restrictions on the use of inmate wages is therefore patently correct.

The second assignment merely laments the denial of the relief sought. Such a purported assignment is so generalized and vague that it does not advise us of the issue submitted for

decision; thus, it is not considered. *Coyle v. Janssen*, 212 Neb. 785, 326 N.W.2d 44 (1982).

Meis next complains of the district court's failure to set a time limit within which the defendants are to provide standards for determining the circumstances under which exceptions to the family limitation are to be made. However, he presents no legal argument in connection with this assignment, and, as consideration of an appeal to this court is limited to the errors assigned and discussed, we do not address the matter. Neb. Ct. R. of Prac. 9D(1)d (rev. 1986); *State v. Jackson*, 225 Neb. 843, 408 N.W.2d 720 (1987).

However, since we do not know that any mechanism to provide for exceptions to the family limitation will be adopted, nor what such a mechanism, if adopted, will be, we base our analysis of the fourth and last assignment of error, that the district court erred in not finding the challenged portion of the memorandum violative of designated portions of the Constitutions of the United States and Nebraska, on the existence of only those provisions of the challenged portion of the memorandum found valid and enforceable by the trial court.

Meis first argues that said remainder of the challenged portion of the memorandum deprives him of a variety of rights guaranteed by the Constitution of this state. Specifically, he cites to that portion of Neb. Const. art. I, § 15, which states: "All penalties shall be proportioned to the nature of the offense, and no conviction shall work corruption of blood or forfeiture of estate"; to § 16, which states: "No bill of attainder, ex post facto law, or law impairing the obligation of contracts, or making any irrevocable grant of special privileges or immunities shall be passed"; to that portion of § 25 which states: "There shall be no discrimination between citizens of the United States in respect to the acquisition, ownership, possession, enjoyment, or descent of property"; and to § 26, which states: "This enumeration of rights shall not be construed to impair or deny others, retained by the people, and all powers not herein delegated, remain with the people."

In considering this phase of Meis' argument, we take instruction from the U.S. Supreme Court's consideration of

prisoners' rights under the federal Constitution.

Accordingly, we recognize that prisons "are not beyond the reach of the Constitution" and that prisoners must be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration. *Hudson v. Palmer*, 468 U.S. 517, 523, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984). However, simply because prison inmates retain certain constitutional rights does not mean that those rights are not subject to restrictions and limitations. Maintaining institutional security and preserving internal order and discipline are essential prison goals which may require the limitation of some of a prisoner's constitutional rights. *Whitley v. Albers,* 475 U.S. 312, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986); *Bell v. Wolfish,* 441 U.S. 520, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). As the U.S. Supreme Court emphasized in *Bell*:

> "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." [Citations omitted.] Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry. Accordingly, we have held that even when an institutional restriction infringes a specific constitutional guarantee, such as the First Amendment, the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security. [Citations omitted.]

441 U.S. at 546-47.

Moreover, as the U.S. Supreme Court has recognized, courts are ill-equipped to deal with the increasingly urgent problems of prison administration and reform; the problems are complex, intractable, and not readily susceptible of resolution by decree. Running a prison is an inordinately difficult undertaking, *Cleavinger v. Saxner,* 474 U.S. 193, 106 S. Ct. 496, 88 L. Ed. 2d 507 (1985), requiring expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. *Turner v. Safley,* _____ U.S. _____, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). In the absence of substantial evidence that prison officials have exaggerated their response to

their concerns for internal security of the institution, courts should generally defer to their expert judgment. *Block v. Rutherford*, 468 U.S. 576, 104 S. Ct. 3227, 82 L. Ed. 2d 438 (1984); *Hudson v. Palmer, supra*.

*Turner v. Safley* held a regulation limiting correspondence between inmates at different institutions was reasonably related to valid corrections goals, but that a regulation preventing an inmate from marrying another inmate or civilian unless the prison superintendent determined there were compelling reasons was not. In making those determinations the *Turner* Court noted that several factors were relevant in determining the reasonableness of the regulations in question. First, there must be a valid, rational connection between the regulation and the legitimate and neutral governmental interest put forward to justify it; second is whether there are alternative means open to the prisoners for the right in question; third is what impact the accommodation of the asserted constitutional right will have on guards, other inmates, and the allocation of prison resources generally; and, finally, whether there are other ready alternatives for achieving the governmental interest.

Those considerations lead us to conclude that, as applied to Meis, there is a valid, rational connection between the remainder of the challenged portion of the memorandum and the internal security of the penitentiary. There is no evidence as to when the debt on which Meis wished to make payment was incurred or the creditor's relationship, if any, to the prison's other inmates. So far as the record shows, the payment might be for an illegal debt incurred while the creditor was Meis' fellow inmate or might be tribute exacted from Meis for and on behalf of another present inmate. Under the circumstances, it cannot be said application of the remainder of the challenged portion of the memorandum to Meis impermissibly deprives him of the Nebraska constitutional rights he has enumerated. The fact the procedure for controlling illegal and security-threatening activities by the inmates may not be perfect does not mean that it must be abandoned and management of the penitentiary turned over to the prisoners.

Finally, Meis argues that he has been denied the equal protection guaranteed him by the "First and Twenty Fifth

Sections of the Nebraska Bill of Rights, and the Fourteenth Amendment to the United States Constitution" (Brief for Appellant at 17) because inmate accounts within the penitentiary are treated differently than inmate accounts at outside financial institutions.

Neb. Const. art. I, § 1, provides: "All persons are by nature free and independent, and have certain inherent and inalienable rights; among these are life, liberty and the pursuit of happiness. To secure these rights, and the protection of property, governments are instituted among people, deriving their just powers from the consent of the governed." Neb. Const. art. I, § 25, provides: "There shall be no discrimination between citizens of the United States in respect to the acquisition, ownership, possession, enjoyment or descent of property. The right of aliens in respect to the acquisition, enjoyment and descent of property may be regulated by law." The relevant portion of the 14th amendment to the U. S. Constitution provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

The guarantee of equal protection of the laws requires that the state's powers be applied in such a manner that all persons shall be treated alike under like circumstances and conditions. See, *Grosvenor v. Grosvenor*, 206 Neb. 395, 293 N.W.2d 96 (1980); *Hartford Co. v. Harrison*, 301 U.S. 459, 57 S. Ct. 838, 81 L. Ed. 1223 (1937). The difficulty in attempting to apply that principle to this case is that no equal protection issue exists. There is absolutely no evidence that the penitentiary administration arbitrarily determined which inmate could place funds in outside financial institutions and which could not, or that Meis was himself prevented from placing his funds in an outside institution. In short, there has been no proof that the state has applied its powers in such a manner as to discriminate against Meis.

AFFIRMED.