Lawrence SARF, as Trustee in Bankruptcy of Eastern Military Academy of New York, Inc., Eastern Military Academy of New York, Inc., Cold Spring Holding Corp. and Richard J. Kirschbaum, Plaintiffs,

v.

TOWN OF HUNTINGTON, Kenneth C. Butterfield, Deirdre M. Conforte, Charles T. Henrich, William Leavy and George S. Stringer, Defendants.

No. CV 79–3149 (RJD).

United States District Court, E.D. New York.

Dec. 14, 1988.

---

## MEMORANDUM AND ORDER

DEARIE, District Judge.

Plaintiffs allege, under 42 U.S.C. § 1983, that the individual defendants violated plaintiffs' constitutional rights when, during the summer of 1978, defendants sought to enforce the safety ordinances of the Huntington Town Code against the Eastern Military Academy (the "Academy"). According to the Complaint, defendants' conduct resulted in the closing of the school's main building, forced the Academy into bankruptcy and violated the due process

---

and equal protection clauses of the Fifth and Fourteenth Amendments.

Defendant Conforte, the assistant town attorney who was responsible for prosecuting all violations of the Huntington Town Code and who is the central figure in this dispute, brought a motion to dismiss on the ground that she is entitled to absolute immunity from suit. The motion was referred to Magistrate David F. Jordan for Report and Recommendation. The Court, after a *de novo* review of the motion pursuant to 28 U.S.C. § 636(b)(1), declines to adopt the Magistrate's recommendation to grant defendant Conforte's motion. For the reasons set forth below, defendant Conforte's motion to dismiss is denied.

FACTS

From the time the Academy was founded in 1944 in Huntington, New York until it was adjudicated bankrupt in 1979, it functioned as a private boarding school for boys who came primarily from the New York Metropolitan area. According to plaintiffs, in the Academy's thirty-four years of existence, the school had never fully complied with the town's safety ordinances. Plaintiffs claim that it was not until the Academy's later years, when the school experienced an increasing percentage of minority enrollment that defendants began to demand the Academy's compliance with all provisions of the Town Code.

The following chain of events is described in detail in plaintiffs' Amended Complaint. For the purposes of this motion, the Court focuses primarily on those allegations that involve defendant Conforte. In January 1978, four summonses were issued to the Academy for violations of the Town Code. Although the Academy originally plead guilty to the charges, the pleas were withdrawn during a March 1978 proceeding in Suffolk County Court because all but one of the necessary repairs had been performed by that time. As a result, those charges were dropped. Defendant Conforte was present at the hearing in her capacity as prosecutor of enforcement actions under the Town Code.

Following the disposition of these charges, the Academy's president was given a list of recommended repairs that defendant Henrich, another town official, said should be completed over the next six months. Plaintiffs claim that it was merely a list of "suggestions" and that no town official stated that any of the "onerous" repairs had to be completed before the school could open in the fall.

During the summer of 1978, defendant Conforte contacted a New York State Department of Education official and informed him of the Academy's unsafe condition. As a result of defendant Conforte's call, the Academy was placed on probation. Defendant Conforte also contacted the Superintendent of the Huntington School District, who stated that he intended to recommend that the Department of Education revoke the Academy's certification. Plaintiffs assert that despite numerous requests, neither defendant Conforte nor any of the other defendants advised them, until it was too late, as to which safety violations had to be remedied before the school would be permitted to open as scheduled.

On August 23, 1978, a major inspection of the main building was conducted by defendant Conforte and others. Plaintiffs allege that although the Academy's owner repeatedly requested the findings from the inspection, none of the defendants provided him with a list of necessary repairs. A week later, defendants issued a Notice and Order, pursuant to Chapter 24 of the Huntington Town Code, which declared the Academy's main building "condemned" and "unfit for human habitation." A large yellow placard stating the same was placed on the school's premises. Plaintiffs also claim that defendant Conforte publicized these events in the media.

From August 23, 1978 to September 5, 1978, the Academy's attorney met with defendant Conforte several times in an attempt to persuade her to reinspect the school and to specify the violations that needed to be corrected at minimum in order to reopen the school on September 14, 1978. Defendant Conforte allegedly told the attorney that additional inspections would be required but she did not, despite his requests, immediately schedule the necessary

inspections. During this period, the Academy's attorney was told, for the first time, that all the "suggestions" on the list received in March 1978 should have been complied with. On September 5, 1978, an inspection of the school's main building was performed by approximately twenty people, including defendant Conforte. This inspection carried over into the following two days.

After the inspection was completed, the Academy's attorney met with defendant Conforte, and she advised him of the results of the inspection and presented him with a revised list of repairs which had to be performed before the main building could be used by the students. The Academy's attorney stated to defendant Conforte that the list could not be completed prior to the beginning of the school term. At this point, the Academy's attorney advised defendant Conforte that he would seek administrative review of the August 30, 1978 Notice and Order and that he would oppose all of the town's actions in court.

A few days, later, the Academy's attorney and the Academy's owner met with defendant Conforte for further discussions concerning the opening of the school. At that meeting, defendant Conforte presented the Academy's owner with a Consent Order which provided that the Notice and Order would be lifted as soon as plaintiffs completed the work enumerated in Schedule A of the worklist; that the Academy would eventually complete Schedule B of the worklist; and that the Academy would waive any of its rights to notice or a hearing regarding the Town's efforts to revoke the school's certificate of occupancy. Defendant Conforte allegedly informed the Academy's owner that once he signed the Consent Order and defendant conducted a "pro forma" inspection of the building, the school would be able to use its main building for the commencement of classes. Plaintiffs also claim that defendant Conforte exhibited a letter, dated September 13, 1978, which stated that there had been "adequate compliance" with Schedule A. Defendant Conforte then promised that the head of the town's Department of Engi-

neering, Building and Housing would sign the letter after the "pro forma" inspection.

As scheduled, on September 13, 1978, defendant Conforte and the other individually named defendants conducted a "pro forma" inspection of the school; but instead of finding "adequate compliance," they determined that the Academy could not open in its present condition. On the following day, which was the first day of classes, the police arrived in squad cars with flashing lights and, with the use of bullhorns, ordered all arriving parents to take their children home.

The Academy's attorney immediately obtained an Order to Show Cause from New York State Supreme Court Justice Thom, and all further town action was stayed until September 21, 1978. At a September 15, 1978 meeting in Justice Thom's chambers, the Academy's Order to Show Cause was vacated and an order based on the signed Consent Order was entered for defendants. This new order restrained the Academy from using the school's main building. On the basis of Justice Thom's order, the police directed everyone who remained at the Academy to leave the main building.

On September 18, 1978, at a hearing before another judge, defendants were told to reinspect the premises, and if substantial compliance with the building repair list was found, the school could reopen. The Notice and Order was lifted, and the Academy reopened on September 19, 1978. Plaintiffs claim that by this time many of the students had withdrawn from the Academy, and the parents of those who remained were reluctant to pay tuition to an institution on the verge of bankruptcy. On December 21, 1978, the Academy filed for bankruptcy, and on September 12, 1979 the school was adjudicated bankrupt.

DISCUSSION

In moving to dismiss the complaint, Conforte argues that as a prosecutor charged with enforcing the Town Code of Huntington, her activities in the summer of 1978 should be protected by a cloak of absolute immunity. Specifically, she claims that those activities were a follow-up to the

January 1978 prosecution and as such came within the scope of quasi-judicial conduct to which such immunity is normally extended. In the alternative, Conforte claims that she is entitled at the very least to a defense of qualified immunity. For the reasons that follow, the Court rejects Conforte's arguments and denies the motion to dismiss.

### A. *Absolute Immunity*

■ The general rule is that a prosecutor, in initiating a prosecution and in presenting the state's case, is absolutely immune from a 42 U.S.C. § 1983 civil suit for damages. *Imbler v. Pachtman*, 424 U.S. 409, 431, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976). In *Imbler*, the Supreme Court outlined the parameters within which a prosecutor is entitled to absolute immunity. *Imbler* established that prosecutors enjoy absolute immunity if their activities are "intimately associated with the judicial phase of the criminal process." *Id.* at 430, 96 S.Ct. at 995. The Supreme Court did not reach the issue of whether absolute immunity attaches when a prosecutor functions as an administrative or investigative officer, rather than as an advocate. *Id.* at 430–31, 96 S.Ct. at 994–95.

However, in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the Supreme Court extended the coverage of its decision in *Imbler*, holding that absolute immunity may encompass administrative agency officials and attorneys involved in administrative proceedings. The Court stated that often times "adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages." *Butz*, 438 U.S. at 512–13, 98 S.Ct. at 2914. The *Butz* Court went on to enumerate the specific characteristics of an administrative proceeding which enabled to conclude that *Imbler* applied in an agency context: a petitioner's ability to present his evidence to an impartial trier of fact and to obtain a judgment as to whether the prosecution was justified, the proceeding's check on possible malicious action by an agency official or agency attorney, the availability of adversarial tools like "cross-examination, rebuttal or reinterpretation by opposing counsel" and a record of the proceedings. *Id.* at 517, 98 S.Ct. at 2916.

■ The Second Circuit has endorsed an approach to the *Imbler* inquiry which requires an examination of the function performed by the prosecutor and the type of injury sustained by the victim. In *Lee v. Willins*, 617 F.2d 320, 322 (2d Cir.1980), the Second Circuit held that absolute immunity is available if the injury arises solely from the prosecution itself, but that it is not available if the alleged harm is inflicted independently of the prosecution. *See Taylor v. Kavanagh*, 640 F.2d 450, 453 (2d Cir.1981); *Robison v. Via*, 821 F.2d 913, 918–19 (2d Cir.1987). As recognized in *Lee*, no bright line separates investigatory and prosecutorial conduct. Thus, in order to be protected by absolute immunity, the alleged harm inflicted by a defendant must result "in substantial part from the protected prosecutorial activities of initiating prosecution or presenting the state's case." *Lee*, 617 F.2d at 322. Redress for harm engendered independently of a prosecution is not barred by *Imbler*. *Id.*

It should also be noted that although the language in *Imbler* stresses the pretrial and trial stages of a prosecution, prosecutorial immunity may extend to post-trial matters as well. *McGann v. Baranowicz*, 617 F.Supp. 845 (S.D.N.Y.1985). In *McGann*, the affidavit submitted by a Criminal Law Investigator in opposition to defendants' motion to vacate his conviction was allegedly false. Thus the post-trial incident was directly related to the criminal case and was intimately related to presenting the state's case in an on-going criminal prosecution. As such, the Criminal Law Investigator's conduct was protected. However, it must be stressed that the post-trial matter has to be intimately related to the prosecution in order for immunity to apply.

■ Mindful of these principles, the Court now turns to a discussion of the "prosecutorial" conduct at issue in the in-

stant action.[1] While at first, the *Butz* case and its progeny might appear to control the outcome of this motion, the Court finds that the factual setting in *Butz* is not analogous to the action before the Court. In the case at bar, there was no enforcement proceeding or impartial trier of fact before whom the plaintiffs could question the validity of the defendant's actions. In fact, it was the plaintiffs who commenced a proceeding when, after the police had told the students to go home on September 14, 1978, the school obtained a stay by Order to Show Cause. This in and of itself should be sufficient reason to take the instant action outside the *Butz* line of cases. In any event, there is no indication in the pleadings or the motion papers that defendant Conforte was on the verge of initiating judicial action against the Academy in order to enforce the Town Code, or that her actions were in some demonstrable way prefatory to necessary judicial enforcement.

More importantly, Conforte *does not* contend that any of her actions taken pursuant to the Town Code, e.g. the August 30 Notice and Order, "triggered" the type of administrative framework or proceedings that would pass muster under the relevant precedents so as to confer absolute immunity.

Furthermore, here, the harm was not intertwined with the initiation or presentation of a case. Plaintiffs went to state court seeking relief for an injury already inflicted outside the protected confines of the judicial process. *See Lee*, 617 F.2d at 322; *see also Taylor*, 640 F.2d at 453. In this connection, although Conforte alleges that her actions were a follow-up to the original proceeding and thus were part of a continuing criminal prosecution initiated in January of 1978, the Academy had resolved the criminal violations when it changed its pleas to not guilty in March of 1978 and the charges were dropped. Although plaintiffs admit they were given an "onerous" list of "suggestions" following their court appearance, there is no indication that the completion of specific repairs was part of the final disposition of the March 1978 criminal action. Thus, it is apparent that defendant Conforte's actions in the summer of 1978 were not, on the record presented here, "post-trial" events related to a prior criminal proceeding. In short, no judicial oversight or control was exercised over the closing of the Academy's main building.

In both *Imbler* and *Butz*, the Supreme Court recognized the need to enable prosecutors to exercise independent judgment without the threat of civil liability. However, the opinions stressed that it was the safeguards built into the judicial process which reduced the need for private damage actions to control unconstitutional conduct. *Butz*, 438 U.S. at 512, 98 S.Ct. at 2913. Defendant Conforte's actions, although directly related to her enforcement duties, were not in any way circumscribed by the judicial process until plaintiffs were forced to seek legal intervention.

Both the Supreme Court and the Second Circuit have stressed that absolute immunity is of a "rare and exceptional character." *Barrett v. United States*, 798 F.2d 565, 571 (2d Cir.1986) (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985)). Absolute immunity "is extended only so far as is necessary to the effective functioning of the judicial process." *Robison v. Via*, 821 F.2d at 918. *See generally Malley v. Briggs*, 475 U.S. 335, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986); *Walden v. Wishengrad*, 745 F.2d 149, 152–53 (2d Cir.1984). Under this stringent standard, which restricts the grant of absolute immunity to rare and exceptional cases, defendant Conforte is not entitled to absolute immunity.

---

**1.** It is important to note that this is not a case in which plaintiffs have claimed that the defendant prosecutor exceeded the bounds of her jurisdiction and proceeded without any colorable authority. *See Barr v. Abrams*, 810 F.2d 358 (2d Cir.1987), ("a crabbed reading of *Imbler* and holding that a prosecutor is without absolute immunity the moment he strays beyond his jurisdictional limits, would do violence to its spirit"); *Rudow v. City of New York*, 822 F.2d 324 (2d Cir.1987). Pursuant to *Imbler* and *Lee*, the first inquiry must be whether the prosecutor was functioning within the broad confines of a judicial proceeding.

**400**

### B. Qualified Immunity

The Second Circuit has recently set forth the general principles regarding when a state official is entitled to a qualified immunity from suit:

It is settled that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 [102 S.Ct. 2727, 2738, 73 L.Ed.2d 396] (1982); *see Procunier v. Navarette,* 434 U.S. 555, 565 [98 S.Ct. 855, 861, 55 L.Ed. 2d 24] (1978)....

"Somewhat more concretely, whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson* [*v. Creighton,* 483 U.S. 635] 107 S.Ct. [3034] at 3038 [97 L.Ed.2d 523] (1987) (quoting *Harlow,* 457 U.S. at 818–19 [102 S.Ct. at 2738–39]). Moreover, the legal rule alleged to be "clearly established" at the time must be sufficiently particularized: "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.... [I]n the light of preexisting law the unlawfulness must be apparent." *Anderson,* 107 S.Ct. at 3039 (citing *Malley v. Briggs,* 475 U.S. 335, 344–45 [106 S.Ct. 1092, 1097–98, 89 L.Ed.2d 271] (1986); *Mitchell v. Forsyth,* 472 U.S. 511, 528 [105 S.Ct. 2806, 2816, 86 L.Ed.2d 411] (1985); *Davis v. Scherer,* 468 U.S. 183, 191, 195 [104 S.Ct. 3012 3017, 3019, 82 L.Ed.2d 139] (1984)). "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow,* 457 U.S. at 818 [102 S.Ct. at 2738]. If the law is not clearly established, summary judgment in favor of the official is usually appropriate. *See Mitchell,* 472 U.S. at 536 [105 S.Ct. at 2820]; *Hawkins v. Steingut,* 829 F.2d 317, 322 (2d Cir. 1987).

*Walentas v. Lipper,* 862 F.2d 414, 421–22 (2d Cir.1988).

 Without further factual elaboration, application of the qualified immunity standard proves to be a difficult task. Plaintiff's complaint states that defendants deprived plaintiffs of their property without due process of law and violated the equal protection clause by selectively enforcing the Huntington Town Code in an effort through racial animus to occasion the permanent closing of the school. Simply put, at this juncture, Conforte cannot claim that a reasonably competent prosecutor would not have known that she was violating plaintiff's clearly established constitutional rights. Further factual developments may dictate otherwise. However, for now, judgment in favor of Conforte would clearly be inappropriate.

SO ORDERED.