Rodney TAYLOR, Plaintiff,

v.

Karen SULLIVAN, Defendant.

No. 91 CIV 4331.

United States District Court, S.D. New York.

Oct. 8, 1997.

Rodney Taylor, pro se.

Dennis C. Vacco, Attorney General of the State of New York, New York, NY by Andrew C. Tsunis, Valerie Singleton, for Defendant.

## OPINION

GOETTEL, District Judge.

Following a three day trial, a jury returned a verdict finding defendant Karen Sullivan liable for intentionally harassing plaintiff Rodney Taylor by filing reports against him that she knew to be false. Defendant then renewed her motion for judgment as a matter of law, as to which decision had been reserved at trial. For the reasons discussed below, defendant's motion is GRANTED.

### FACTUAL BACKGROUND

Plaintiff Rodney Taylor ("Taylor") was released from the Sing Sing Correctional Facility on Friday, September 16, 1988.[1] On

---

1. Plaintiff is no stranger to the State of New York's legal system, correctional facilities, or division of parole. As of February 14, 1989, he had 42 prior arrests, many of which resulted in convictions. Prior to the events giving rise to this litigation, Taylor was serving sentences for convictions for Robbery 2nd Degree, Criminal Possession of Stolen Property 1st Degree, and

Monday, September 19, 1988, he made an arrival report at the Mt. Vernon Area Office of the New York State Division of Parole and completed a form indicating that he would be residing at a rooming house at 535 South 7th Avenue in Mt. Vernon, New York. Although he did not at that time meet with defendant Parole Officer Karen Sullivan ("Sullivan"), she was subsequently assigned to supervise him.

On September 27, 1988, Taylor did not report to the Mt. Vernon Parole Office despite having been instructed to do so during his arrival report. Sullivan then made a home visit to the rooming house, wherein she learned from the proprietor that Taylor had never lived there.

On October 11, 1988, Taylor made his first office report to the Mt. Vernon office. At trial, he disputed Sullivan's assertion that he appeared "disheveled" at this meeting, but admitted that he had spent the night drinking and sleeping on a park bench. At the beginning of this visit, Taylor and Sullivan's first meeting, Sullivan either observed a bulge in Taylor's trenchcoat pocket, heard a "clank," or both. Taylor was subsequently handcuffed and, after a delay of disputed length, he was pat-frisked by Sullivan in the presence of Parole Officer Frank Viggiano, Jr. During the search, Sullivan recovered a partially empty bottle of peach schnapps, but no other contraband.

When asked where he was residing, Taylor admitted that he did not live at the 535 South 7th Avenue address, but stated that he was staying with his aunt and uncle at 421 South 7th Avenue. After discussing with her supervisor Taylor's failure to notify her of a residence change, a violation of Rule # 4 of the rules governing Taylor's parole,[2] Sullivan decided to allow Taylor to remain on parole supervision. She removed the handcuffs, and after further discussion, instructed Taylor to report again at 10:30 a.m. on October 18, 1988, in order to discuss his background and needs.

On October 18, 1988, Taylor failed to report as instructed, but did report that evening to a report center at City Hall. At that time, Sullivan informed Taylor that he must report again at 10:30 a.m. on October 21, 1988, at the parole office for a special meeting.

On October 20, 1988, at approximately 4:15 p.m., Taylor reported to the Mt. Vernon parole office. Sullivan was out of the office, and Taylor spoke with Parole Officer Donnie Rogers ("Rogers"), Sullivan's partner. Taylor told Rogers that he was moving his residence upstate that night because of a family

Grand Larceny 3rd Degree. He was released on parole from the Greene Correctional Facility on November 10, 1987, while serving time for these offenses. He was the subject of a violation of release report after he was arrested and charged with Criminal Possession of Controlled Substance 7th Degree and Possession of a Hypodermic Instrument. Following his parole revocation and confinement at Sing Sing that resulted from these charges, plaintiff was again released on parole on September 16, 1988.

Although defendant sought to impeach Taylor's testimony or otherwise introduce evidence of his prior convictions, these efforts were thwarted by our in-court rulings. We sustained plaintiff's objections to the introduction of his prior convictions since these convictions were beyond the period allowed under Rule 609 of the Federal Rules of Evidence. The jury was informed of some of Taylor's convictions, however, as the result of him specifically eliciting such testimony from a witness. In his redirect examination of Senior Parole officer John Rogan ("Rogan"), plaintiff inquired, "As far as you know, have I ever been convicted of rape?", "Any kind of pedophilia?", "Any type of homicide?", "Any

type of assault on a person?" After Rogan responded that he was not aware of plaintiff being convicted for any such crimes, Taylor continued, "So if I never raped anybody and if I never killed anybody and if I never assaulted anybody, what is left as far as me being such a dangerous person?" At this point, Rogan stated that plaintiff had been convicted of robbery, possession of stolen property, and grand larceny, had been arrested for various crimes, and had violated his parole several times.

2. Rule 4 states:

I will permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection of my person, residence and property. I will discuss any proposed changes in my residence, employment or program status with my Parole Officer. I understand that I have an immediate and continuing duty to notify my Parole Officer of any changes in my residence, employment or program status when circumstances beyond my control make prior discussion impossible.

emergency[3] and asked to be excused from reporting the next day. Rogers excused Taylor from reporting the next day, but apparently did not understand from their conversation that Taylor had been specifically instructed by Sullivan to report on the morning of October 21, 1988 for a special meeting. Instead, Rogers likely assumed that the October 21, 1988 report was to be a regularly scheduled report.

After being informed by Rogers that Taylor would not be reporting that morning, Sullivan and Senior Parole Officer John Rogan ("Rogan") visited Taylor's aunt's residence. The aunt allegedly informed them that Taylor had slept there that night, had not yet moved upstate, and had just left for the welfare office a few minutes earlier.[4] Rogan and Sullivan attempted to find Taylor at the welfare office, but they were unsuccessful.

Taylor telephoned Sullivan on October 25, 1988, his next reporting date, to say that he had decided to report to his former parole office in Ulster County. Sullivan directed Taylor to report to her at the Mt. Vernon parole office by 8:00 p.m., but he failed to appear. Sullivan prepared a violation of release report, signed by both her and Rogan, dated October 27, 1988, which charged Taylor with failing to appear on October 21, 1988, but made no mention of his absence on October 25, 1988. A parole arrest warrant was also signed by Rogan and issued.

Taylor did not subsequently report to either Sullivan or his former parole officer, and his whereabouts were unknown to the Division of Parole until he was arrested as a parole violator in Ulster County on December 6, 1988. On December 7, he was served with a notice of violation and violation of release report at the Ulster County Jail. At that time, Taylor requested a preliminary hearing.

Taylor was charged with two violations of parole: (1) failing to report on October 21, 1988, as directed; and (2) lying to Rogers on October 20, 1988, when he stated he could not report on October 21, 1988 because he was moving upstate. A preliminary parole revocation hearing was held at the Ulster County Jail on December 15, 1988, at which Rogan testified on behalf of the Division of Parole. Sullivan was not in attendance. At the conclusion of the hearing, probable cause to believe a violation had been committed was found. A final hearing was held on February 14, 1989 at the Ulster County Jail. Sullivan and Rogan were present at that hearing and both testified on behalf of the Division of Parole.

In a written decision issued on March 17, 1989, charge one was sustained and charge two was dismissed. In reviewing the evidence as to charge two, the hearing officer noted the absence of Rogers' testimony and the unavailability of Taylor's aunt's testimony due to her death. The hearing officer therefore found that "there was insufficient evidence to show by a preponderance that the parolee lied to Parole Officer Rogers." The Board of Parole ("the Board") consequently revoked Taylor's parole and ordered him held for one year. Taylor filed a petition for a writ of habeas corpus with the Special Term of Ulster County Supreme Court in December, 1988. On March 30, 1989, he filed a notice of intent to administratively appeal the decision of the Board revoking his parole.

In April, 1988, the Attorney General's Office mailed a copy of the habeas corpus petition to the Division of Parole's Counsel's office, requesting further information in order to respond to the petition. Thereafter,

---

**3.** Taylor's family emergency was that his aunt was terminally ill. While the undisputed evidence showed that plaintiff's aunt was ill, moving his residence upstate meant that plaintiff would be farther away her. As is discussed below, at trial, plaintiff admitted that his aunt's illness was not the real reason for him wanting to move upstate, but rather he sought to move in order to get away from Sullivan since he feared that she would act to revoke his parole.

**4.** Taylor's aunt died sometime after this incident and before ever having been deposed or further questioned by either side. While Taylor apparently disputes the accuracy of his aunt's alleged assertion, he offered no explanation for this remark and did not testify that he had not stayed at his aunt's house on the night of October 20, 1988.

the Appeals Unit's counsel recommended reversal of the Board's earlier determination,[5] noting:

> Upon review of the petition, the Violation of Release Report and the transcript of the final hearing, it is apparent that the parolee's claim has merit. Failure to report on 10/21/88 was the sole charge ultimately sustained by the Hearing Officer and affirmed by the Commissioner. While a review of the final hearing transcript indicates that sufficient evidence may have existed to sustain other potential charges of violation of parole,[6] such charges were not included in the report under consideration at the time of the hearing. Moreover, the final hearing transcript reflects testimony by Division witnesses that the parole officer's partner may have excused the parolee from reporting as originally directed by his parole officer. In addition, the parole officer who excused the parolee from reporting on the day in question was not produced as a witness at the revocation hearing; thus preventing the Division from substantiating the exact nature and scope of the permission not to report. On that basis, there was insufficient evidence produced to sustain the charge of failing to report, and accordingly the revocation of parole should be reversed, delinquency canceled and appellant restored to parole supervision.

On May 4, 1989, Taylor was released and restored to parole supervision pursuant to an unpublished decision of the Appeals Unit of the Division of Parole.

## LEGAL BACKGROUND

On June 10, 1991, Taylor initiated this lawsuit against Sullivan and Senior Parole Officer Rogan. In his complaint, Taylor alleged that Sullivan unnecessarily touched his genitals during the pat-frisk she performed on him during his office visit on October 11, 1988. He also alleged that Sullivan harassed him by requiring him to make a total of seven office reports in less than 21 days. Finally, Taylor alleged that Sullivan intentionally and falsely filed a violation of release report against him concerning his failure to report on October 21, 1988. As against Rogan, Taylor alleged that Rogan conspired with Sullivan to falsely pursue the violation of release report.

In a November 25, 1992 decision on plaintiff's and defendants' cross-motions for summary judgment, we denied both motions as to the claims against Sullivan since the factual circumstances surrounding plaintiff's claims were in dispute. We did, however, grant defendants' motion as to the claims against Rogan. As we found in that decision, and as the evidence amply proved at trial, the worst that can be said of Rogan is that he, was negligent. Mere negligence by a state official does not violate a person's rights under the Fourteenth Amendment or Section 1983. *See Daniels v. Williams,* 474 U.S. 327, 330–32, 106 S.Ct. 662, 664–66, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986). Moreover, we found that Rogan was entitled to qualified immunity since it was objectively reasonable for him to believe that his acts did not violate Taylor's rights. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).

On May 11, 1993, this case was transferred to the suspense docket since Taylor was incarcerated and had informed the Court that he would be incarcerated for at least another year. On April 28, 1997, we ordered that the

---

**5.** Taylor argued several times to the jury that the original determination was found to be arbitrary and capricious. This was clearly a misstatement. The form containing the Appeals Unit's Counsel's findings has a section which indicates the basis for the appeal. One of the checked boxes was for "arbitrary and capricious," thereby noting that Taylor sought review of his parole revocation based on his belief that the determination was arbitrary and capricious. Contrary to plaintiff's assertions, the Appeals Unit never found the original determination to be arbitrary and capricious, but rather reversed the Board's original determination based on an insufficiency of evidence to support the findings as to the October 21, 1988 reporting date.

**6.** It is undisputed that plaintiff made no reports after October 20, 1988. Perhaps because of an oversight, however, plaintiff was only charged with failing to report on October 21, 1988, and not for having failed to report at anytime thereafter.

case be returned to active status after being informed that Taylor was about to be released from prison. The trial was subsequently set to, and did, begin on August 25, 1997.[7]

On August 20, 1997, the Assistant Attorney General representing Sullivan filed a motion in limine requesting that we dismiss that portion of the complaint alleging damages emanating from the filing of an alleged false charge. The current Assistant Attorney General representing Sullivan is not same attorney that represented defendant when she moved to dismiss the complaint and moved for summary judgment in 1991 and 1992, and the motion in limine raised new legal arguments not set forth in prior motions.

At the beginning of trial, we stated our belief that defendant's motion in limine was in reality an untimely motion to dismiss. We therefore reserved ruling on the motion, indicating that we would address the issue after trial, if need be. Both at the conclusion of plaintiff's case and at the close of all evidence, defendant moved pursuant to Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law on plaintiff's claim that Sullivan could be held liable as a parole officer for having filing an allegedly false parole violation report. We also reserved ruling on these motions.

On the third day of the trial, after closing arguments and the jury charge, the jury began deliberations at approximately 11:00 a.m. The jury sent a note out at approximately 2:00 p.m. requesting a reading of the transcript on four separate issues, at least one of which seemed to the Court to be completely irrelevant to the issues presented to the jury. At 3:10 p.m., the jury requested that we repeat our charge on qualified immunity, and about 30 minutes later, the jury returned with a verdict.

The jury found that Sullivan had not intentionally touched Taylor's genitals, but found that Sullivan had intentionally harassed Taylor by filing false reports against him.[8] The jury further found that the defendant was not entitled to qualified immunity on the second claim, and that plaintiff was entitled to $800 for compensatory damages on that

---

**7.** Although we were reluctant to require the state to go to the expense of presenting Taylor for trial while he was incarcerated, we ultimately had to require the state to produce him. On August 22, 1997, the Friday before the trial was to begin, Taylor was again arrested for violation of parole. We have no knowledge of the circumstances surrounding this arrest, but since a jury had already been selected, we were unwilling to postpone the trial.

**8.** On a special verdict form, the jury answered "NO" to the question # 1, which stated: "Has the plaintiff Rodney Taylor proven by a preponderance of the evidence that the defendant Karen Sullivan unnecessarily and intentionally touched his genitals?" The jury answered "YES" to question # 2, asking: "Has the plaintiff proven by a preponderance of the evidence that the defendant intentionally harassed him by filing reports against him that she knew to be false?"

In contrast to our belief regarding the jury's finding on the second claim, we do not question the jury's finding as to plaintiff's first claim. There was clearly no evidence to support plaintiff's claim that defendant had intentionally and unnecessarily touched his genitals. Sullivan testified that she had not touched Taylor's genitals. The only evidence offered in support of this claim was plaintiff's own testimony. However, both on direct examination and on cross examination, plaintiff admitted that he was not sure whether the touching had been intentional. On cross examination, he vigorously asserted, "I don't know whether it was intentional or not, only that it happened." This testimony, the only evidence supporting the sexual harassment claim, did not rise to the level of a preponderance of the evidence necessary to support a finding that defendant had intentionally touched his genitals.

We had previously granted defendant's motion for judgment as a matter of law on plaintiff's claim that Sullivan had intentionally harassed him by requiring him to report to her seven times during one month. Without addressing whether this claim presented a viable constitutional rights violation, we found this claim to be factually unsupported. All of the evidence, including plaintiff's testimony, showed that plaintiff had only met with Sullivan twice during the one month period during which time he was under her supervision. Although she had directed him to report on two other occasions, plaintiff had not done so. Moreover, while plaintiff testified that he had appeared at the Mt. Vernon office seven times, he admitted that he had not been required to do so by defendant. Based on the lack of evidence supporting plaintiff's claim that defendant had harassed him by requiring him to report too frequently, we granted defendant's motion for judgment as matter of law on this claim.

claim.[9] Finally, the jury found that the defendant had not acted wilfully, wantonly, maliciously, or with reckless disregard of the plaintiff's rights, so as to entitle plaintiff to punitive damages.

## DISCUSSION

■ We believe the jury's verdict on the second claim was clearly a compromise verdict.[10] As discussed below, we find no evidence supporting plaintiff's claim that Sullivan intentionally filed false reports against him. In addition, if there had been evidence to support such a finding, the jury's award of compensatory damages of $800 would appear to be grossly inadequate to compensate plaintiff for having been unfairly incarcerated for 5 months.[11] We therefore find that the "record itself viewed in its entirety . . . clearly demonstrate[s] the compromise character of the verdict." *Maher v. Isthmian Steamship Co.*, 253 F.2d 414, 419 (2d Cir.1958). Such a verdict can be set aside.

We do not, however, grant defendant's motion on the grounds that there was insufficient evidence to support the jury's verdict that Sullivan intentionally filed false reports against him. Only if there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against" Sullivan, may we properly grant this motion. *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 429 (2d Cir.1995) (quoting *Song v. Ives Laboratories, Inc.*, 957 F.2d 1041, 1046 (2d Cir.1992) and noting that the standards for granting a motion for "judgment as a matter of law" are the same as the standards previously employed for

granting a "judgment n.o.v."). Mindful that we must "consider the evidence in the light most favorable to" Taylor, giving Taylor "the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence," and refusing to independently "assess the weight of conflicting evidence, pass on the credibility the witnesses, or substitute [our] judgment for that of the jury," *id.* at 429 (quoting *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 367 (2d Cir. 1988)), we would be reluctant to grant defendant's motion solely on the grounds that there existed no evidentiary basis for the jury's verdict that Sullivan had intentionally filed false reports against Taylor. We need not determine whether the evidence sufficiently supports the jury's finding, however, since we find that, even accepting this finding, defendant is nonetheless still entitled to judgment as a matter of law.

### 1. Determination of Constitutional Violation

Before reaching the question of whether defendant is entitled to a defense of absolute or qualified immunity, we must first examine whether a constitutional violation has occurred. *See Calhoun v. New York State Division of Parole Officers*, 999 F.2d 647, 652 (2d Cir.1993).

Defendant argues that plaintiff's claim that she filed false reports against him does not independently state a constitutional violation. Citing *Freeman v. Rideout*, 808 F.2d 949, 952 (2d Cir.1986), *cert. denied*, 485 U.S. 982, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988), defendant argues that plaintiff has no "constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." Rather, plaintiff's only constitutional right with regards to the reports filed

---

**9.** The major claim of damages plaintiff presented was his testimony that as a result of the violation of parole report filed by defendant, and before the Board's first determination was overturned, he had been reconfined at Sing Sing for approximately 5 months. During closing arguments, plaintiff requested a monetary award to make him whole for these 5 months during which time he had been incarcerated.

**10.** A compromise verdict "typically involves a jury that, unable to agree on liability, compro-

mises in the amount of damages." *Trinidad v. American Airlines, Inc.*, No. 93 Civ. 4430(SAS), 1997 WL 79819 at *3 (S.D.N.Y.1997).

**11.** While this $800 verdict is relatively small, it is a significant decision. Thousands of parole violations are issued each year, and if all such violations that are eventually overturned could give rise to a civil claim, parole officers of this State may well be overwhelmed by lawsuits.

against him was his right to not have his liberty deprived without procedural safeguards or due process. Since plaintiff does not allege that any subsequent hearings or reviews of the charges against him violated his due process rights, defendant argues that the mere act of filing a false report did not violate plaintiff's constitutional rights.

*Freeman v. Rideout* involved an inmate's section 1983 action against a correctional officer who had instituted allegedly false charges against him resulting in a 30–day disciplinary segregation. The issue was whether an inmate has a right to be free from false accusations that resulted in his disciplinary segregation. Finding that the inmate did not suffer a constitutional violation for having been allegedly falsely accused, the Court held:

> There appears to be a confusion between the existence of a constitutionally protected right, and the deprivation of that right without procedural safeguards or due process. The constitutionally protected interest in this case is the right of liberty. The fourteenth amendment does not prohibit every deprivation of liberty. It does, however, prohibit the deprivation of liberty without due process of law.

> The prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest. The plaintiff, as all other prison inmates, has the right not to be deprived of a protected liberty interest without due process of law.

808 F.2d at 951 (citations omitted).

Following its decision in *Freeman*, the Second Circuit held in *Franco v. Kelly*, 854 F.2d 584, 585 (2d Cir.1988), that "an allegation that state prison officials intentionally filed false disciplinary charges against an inmate, in retaliation for the prisoner's exercise of a constitutional right, states a cause of action for damages under 42 U.S.C. § 1983." In distinguishing *Freeman*, the Court differentiated between prison official's conduct that allegedly infringes a prisoner's procedural due process rights from conduct that allegedly infringes an inmate's substantive constitutional rights.

In *Franco*, the plaintiff had alleged that prison officials intentionally filed false disciplinary charges against him in retaliation for his cooperation with a state administrative investigation of alleged incidents of inmate abuse at the prison. The Court held that the "right to petition [the government for redress of grievances] is substantive rather than procedural and therefore cannot be obstructed, regardless of the procedural means applied." 854 F.2d at 589 (citations omitted). The act of allegedly filing a false report was therefore found to state a cause of action if that false report was filed in retaliation for an inmate exercising a constitutional right. *Id.* at 590 ("An act in retaliation for the exercise of a constitutional right is actionable under section 1983 even if the act, when taken for different reasons, would have been proper.") (citations omitted).

Subsequently, the Second Circuit has discussed *Freeman* and *Franco* in *Grillo v. Coughlin*, 31 F.3d 53, 56–57 (2d Cir.1994). The Court explained that the holding of *Freeman* was that a "fair hearing, conforming to the due process standards of *Wolff* [*v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ], would 'cure' a constitutional violation otherwise resulting from a false accusation." 31 F.3d at 56. In addition, the Court explained that *Franco* stood for the proposition that "*Freeman* applies only in the case of a complaint that alleges solely procedural, as opposed to substantive, due process violations." *Id.* at 57.

■ These statements in *Grillo* support the broader proposition that, while a prisoner's constitutional rights are not violated solely by being falsely accused of misconduct, false allegations that immediately interfere with substantive constitutional rights do violate a prisoner's constitutional rights. *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2nd Cir.1997) ("[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report. There must be more .... [to constitute a constitutional violation].") (citations omitted); *McCorkle v. Walker*, 871 F.Supp. 555, 558 (N.D.N.Y.1995) ("*Freeman* ... does not apply to situations in which there are allega-

tions that an inmate's substantive due process rights were violated despite the fairness of the procedures used."); *Wright v. Santoro*, 714 F.Supp. 665, 667 (S.D.N.Y.) ("Absent any facts showing that such a [false disciplinary] report actually deprived plaintiff of liberty or property, ... no Constitutional issue is raised."), *aff'd*, 891 F.2d 278 (2d Cir.1989); *Anderson v. Sullivan*, 702 F.Supp. 424, 427 (S.D.N.Y.1988) ("The filing of false disciplinary charges may support a claim under § 1983 where the accusation infringed on an inmate's substantive constitutional rights."); *Garrido v. Coughlin*, 716 F.Supp. 98, 101 (S.D.N.Y.1989) (citing above language from *Anderson v. Sullivan* ).

 In light of the above, we find defendant's reliance on *Freeman* misplaced. In addition to the fact that *Freeman* involved a prison inmate and not a parolee,[12] the Court's decision in *Freeman* rested upon the fact that *before* Freeman could be placed in segregation, he was granted a hearing. 808 F.2d at 951. Freeman's subsequent disci-

plinary confinement, therefore, was a result of "the finding of guilty by the prison disciplinary committee hearing, and not merely because of the filing of unfounded charges by the defendant [correctional officer]." 808 F.2d at 953. In contrast, here, Taylor was first held in custody on December 6, 1988, pursuant to the parole warrant, and he did not receive his probable cause hearing until December 15, 1988. Sullivan's representations to Rogan, who had little personal knowledge of Taylor's misconduct, thus directly resulted in Rogan's issuance of the parole warrant, which directly resulted in Taylor's first nine days of incarceration. While Taylor's subsequent confinement after the probable cause hearing was a result of both Sullivan's charges and the hearing officer's finding of probable cause, his initial confinement was the direct result of only Sullivan and Rogan's actions. Under these circumstances, we find that an intentionally false report, directly causing the loss of liberty,[13] can state a cause of action for deprivation of a parolee's constitutional rights.[14]

**12.** "The status of parolees in our legal system is unique; they are 'neither physically imprisoned nor free to move at will.'" *United States v. Thomas*, 729 F.2d 120, 123 (2d Cir.) (*quoting United States v. Polito*, 583 F.2d 48, 54 (2d Cir. 1978)), *cert. denied*, 469 U.S. 846, 105 S.Ct. 158, 83 L.Ed.2d 95 (1984). As such, a parolee does not enjoy the "absolute liberty to which every citizen is entitled, but only [a] conditional liberty properly dependent on observances of special parole restrictions." *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). This "conditional liberty" of a parolee, undoubtedly greater than the liberty enjoyed by a prison inmate, "includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others." *Id.* at 482, 92 S.Ct. at 2601.

**13.** Our holding is limited to a *parolee's* liberty interest in not having his conditional release unfairly revoked. A *prison inmate's* liberty interest in being free from disciplinary confinement is less certain. In *Sandin v. Conner*, 515 U.S. 472, 483–85, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995), the Supreme Court held that disciplinary confinement does not deprive an inmate of a liberty interest unless the confinement imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Miller v. Selsky*, 111 F.3d 7, 8–9 (2d Cir.1997). In contrast, the revocation of a parolee's conditional release definitely implicates a parolee's liberty interests. *See Moody v. Daggett*, 429 U.S. 78, 87, 97 S.Ct. 274, 279, 50

L.Ed.2d 236 (1976) ("execution of the [parole] warrant and custody under that warrant [is] the operative event triggering any loss of liberty attendant upon parole revocation. This is a functional designation, for the loss of liberty as a parole violator does not occur until the parolee is taken into custody under the warrant.").

**14.** But see *Threat v. Russi*, 784 F.Supp. 65, 68 (W.D.N.Y.1992), wherein then Chief Judge Telesca addressed the same issue of whether "the *Freeman* court's holding also applies to Parole Officers who knowingly file a report against a parolee, which contains false or erroneous information." That case involved a parolee's *section* 1983 action against, among others, his parole officer for having filed a notice of parole violation implicating plaintiff in the commission of crimes he allegedly knew plaintiff had not committed. Finding that *Freeman* did apply, the court reasoned that the "only difference" between the fact pattern in *Freeman* and the fact pattern there, was "the status of the plaintiff at the time of the alleged violation." 784 F.Supp. at 68. The court found this difference between a parolee and a prisoner inconsequential for these purposes, and held that "the filing of a false or unsubstantiated Parole Violation report ... [was] no different than the filing of a false or baseless misbehavior report [against a prisoner]." *Id.* at 68. The court therefore concluded that the plaintiff had not stated a cause of action against his parole officer for the violation of his fourteenth amendment rights.

### 2. Absolute or Qualified Immunity

We next address whether Sullivan is entitled to absolute or qualified immunity for her actions. The Second Circuit has specifically addressed these issues, as they relate to New York State parole officers, in a rather concise opinion.[15] In *Stewart v. Lattanzi*, 832 F.2d 12 (2d Cir.1987), the Court first discussed the standards which govern our analysis, and then applied these standards to a parole officer's conduct:

> The Supreme Court has adopted a functional approach to determine the level of immunity afforded governmental officials. *See Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). If the official acts adjudicatively, the official probably has absolute immunity. If the official acts executively, the official probably has qualified, good-faith immunity. Qualified immunity will be provided if the "conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harper v. Jeffries*, 808 F.2d 281, 284 (3d Cir.1986) (citing *Harlow v. Fitzgerald*, 457 U.S. 800,

818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). This court has recognized that "absolute immunity is of a 'rare and exceptional character.'" *Barrett v. United States*, 798 F.2d 565, 571 (2d Cir.1986) (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 202, 106 S.Ct. 496, 501, 88 L.Ed.2d 507 (1985)); *Dorman v. Higgins*, 821 F.2d 133, 136 (2d Cir.1987).

> This court looks at the function of the individual in determining the appropriate level of immunity given a government official. .... Some factual inquiry must be made to determine whether the duties of the defendants were judicial or prosecutorial in nature entitling them, or any of them, to absolute immunity. Alternatively, this factual inquiry may show their duties to be administrative in nature, entitling the defendants to qualified immunity. *See Anderson v. New York State Div. of Parole*, 546 F.Supp. 816 (S.D.N.Y.1982).

832 F.2d at 13. We therefore must determine whether Sullivan acted in a judicial or prosecutorial capacity, entitling her to absolute immunity, or rather in an administrative capacity, entitling her to only[16] qualified immunity.[17]

---

This holding may be distinguishable from the instant case. In *Threat*, the plaintiff was arrested and charged with possession of stolen property, possession of a dangerous weapon, unlawful imprisonment, driving while intoxicated and various other traffic offenses while on parole from a previous sentence. *Id.* at 66. The charges against him were heard by a grand jury, but the grand jury did not return an indictment. Despite the dismissal of these criminal charges, parole violation proceedings were commenced against Threat and his parole was revoked. It is unclear from the opinion how long Threat was incarcerated following the dismissal of the criminal charges against him but prior to his parole hearing. Apparently addressing only the deprivation of liberty involved in the revocation of Threat's parole, and not any deprivation that may have occurred prior to the parole revocation, the court found Threat " 'suffered as a result of the finding of [a parole violation by the parole board] and not merely because of the filing of unfounded charges by the defendant.' " *Id.* at 68 (alteration in original) (*quoting Freeman*, 808 F.2d at 952). As already discussed, here, plaintiff suffered alleged improper incarceration for 9 days prior to his probable cause hearing.

**15.** The U.S. Supreme Court has specifically "reserve[d] the question of what immunity, if any, a state parole officer has in a § 1983 action where

a constitutional violation is made out by the allegations." *Martinez v. California*, 444 U.S. 277, 285 n. 11, 100 S.Ct. 553, 559 n. 11, 62 L.Ed.2d 481 (1980).

**16.** While we recognize that this "less-than-absolute protection [of qualified immunity] is not of small consequence," *see Cleavinger v. Saxner*, 474 U.S. 193, 206, 106 S.Ct. 496, 503, 88 L.Ed.2d 507 (1985), there is little doubt that absolute immunity provides greater protection against vindictive lawsuits that may be brought by disappointed parolees against their parole officers. Judge Keenan has observed:

> This Court agrees that parole officials must be protected from civil damages liability if they are effectively to perform their duties. To withhold absolute immunity from parole officials acting in their adjudicatory functions would be to dangle the sword of Damocles over their service and surely impede the administration of an already taxing process.

*David v. Rodriguez*, No. 88 CIV 2115(JFK), 1989 WL 105804 at *2 (S.D.N.Y. Sept.5, 1989)

**17.** Since the Second Circuit has specifically stated that such an analysis concerning parole officers should be governed by a determination of whether the conduct was prosecutorial or admin-

■ Sullivan's conduct in question here involves her actions of obtaining a parole warrant from Rogan, and of preparing and filing the violation of release report. As already discussed, these actions, taken pursuant to New York Executive Law § 259–i(3)(a)(i),[18] directly resulted in plaintiff's arrest and initial confinement. While these actions are arguably similar to a police officer's actions of seeking an arrest warrant from a magistrate, actions entitled to only qualified immunity, *see Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986), we believe at least one significant difference warrants the granting of absolute immunity to Sullivan: Sullivan did not need *independent* approval to obtain Taylor's arrest. Her actions were therefore prosecutorial in nature.

A parole officer's reporting to a member of the board of parole (or any officer of the division designated by the board) in seeking a parole warrant is a much more informal procedure than a police officer obtaining an arrest warrant from a magistrate. Unlike the independent roles served by a magistrate and a police officer, the parole officer seeking a parole warrant is in actuality merely working together with a co-worker, here Rogan, pursuing the common goal of prosecuting a parole violation. In preparing the violation of release report, Sullivan formulated the charges against Taylor and then requested and received from Rogan, her supervisor, a violation of parole warrant. Although New York law required Sullivan to obtain the warrant from Rogan, and she could not issue it herself, we find this formality inconsequential. Without the assistance of independent sources of authority, Sullivan initiated and brought about Taylor's arrest and initial confinement.

Sullivan was thus acting as an advocate of the State when she sought the warrant and filed the violation of release report. *See Doe v. Phillips,* 81 F.3d 1204, 1209 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1244, 137 L.Ed.2d 326 (1997). Although Sullivan also performed investigative work for which she would be entitled only to qualified immunity, *see Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 113 S.Ct. 2606, 2615–16, 125 L.Ed.2d 209 (1993), her challenged conduct here was similar to that of a "prosecutor in preparing for the initiation of a prosecution or for judicial proceedings," conduct entitled to absolute immunity. *Id.*

Although a police officer's investigative work is in some degree preparation for initiation of prosecution, as Judge Scullin recognized in *Gelatt v. County of Broome,* 811 F.Supp. 61, 68–69 (N.D.N.Y.1993), a parole officer's greater responsibility of determining and then executing her decision that Taylor should be arrested for violation of his parole

---

istrative, we do not focus on the six non-exclusive factors set forth in *Butz v. Economou,* 438 U.S. 478, 512, 98 S.Ct. 2894, 2913–14, 57 L.Ed.2d 895 (1978) and discussed in *Cleavinger,* 474 U.S. at 202, 106 S.Ct. at 501, that should be considered when determining whether a state official is entitled to absolute immunity. These six factors are:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

*Cleavinger,* 474 U.S. at 202, 106 S.Ct. at 501. We note, however, that under this analysis, we would likewise conclude that defendant is entitled to absolute immunity for her actions for the same reasons found by Judge Nickerson in *Conner v. Alston,* 701 F.Supp. 376 (E.D.N.Y.1988). *But see LaFrance v. Rampone,* 678 F.Supp. 72, 76

(D.Vt.1988) (discussing the six factors as they relate to Vermont parole officers, and holding that "the absence of safeguards to protect against improper performance necessitates granting [parole officers] a qualified, rather than an absolute, immunity from suit.").

**18.** New York Executive Law § 259–i(3)(a)(i) states, *inter alia:*

> If the parole officer having charge of a paroled or conditionally released person or a prisoner received under the uniform act for out-of-state parolee supervision shall have reasonable cause to believe that such person has lapsed into criminal ways or company, or has violated one or more conditions of his parole, such parole officer shall report such fact to a member of the board of parole, or to any officer of the division designated by the board, and thereupon a warrant may be issued for the retaking of such person and for his temporary detention in accordance with rules of the board.

differentiates a parole officer from a police officer or a probation officer,[19] and makes Sullivan's conduct most similar to that of a prosecutor. Employing a functional test for immunity, *see Butz v. Economou,* 438 U.S. 478, 511–12, 98 S.Ct. 2894, 2913–14, 57 L.Ed.2d 895 (1978), we therefore find Sullivan's actions most similar to the prosecutorial conduct of a prosecutor, thereby entitling Sullivan to absolute immunity.

Although at odds with some decisions in other circuits,[20] this holding is in accord with at least five other district court cases in this circuit that have found similar conduct by a parole officer entitled to absolute immunity. *See Scotto v. Almenas,* No. 95 CIV 9379(JSM), 1996 WL 492996 (S.D.N.Y. Aug.28, 1996) (parole officers' actions of "deciding whether or not to charge plaintiff with a parole violation ... are more closely analogous to a prosecutor's decision to initiate a prosecution than to a police officer's decision to arrest.... In short, because [the parole officers] were exercising discretion in deciding whether or not to charge plaintiff with a parole violation, they were acting in an adjudicative rather than an administrative manner."); *David v. Rodriguez,* No. 88 CIV 2115(JFK), 1989 WL 105804 (S.D.N.Y. Sept.5, 1989) (parole officer who participated in plaintiff's parole revocation hearing by filing the notice of violation and presenting the case for revocation at the preliminary hearing performed adjudicatory functions protected by absolute immunity); *Miller v.*

*Garrett,* 695 F.Supp. 740, 745 (S.D.N.Y.1988) (by filing the notice of violation and violation of release report, presenting the case for revocation at both the preliminary and final hearings, testifying at the preliminary hearing, and producing evidence and a witness at the final hearing, the parole officer "performed a role comparable to a prosecutor in a criminal case, and therefore also is entitled to absolute immunity."); *Chitty v. Walton,* 680 F.Supp. 683, 686 (D.Vt.1987) (holding that parole officer's "role in preparing the parole report was so closely associated with the Parole Board's quasi-judicial function in adjudicating parole requests that defendants must be accorded absolute immunity to protect the integrity of the parole review process."); *Johnson v. Kelsh,* 664 F.Supp. 162, 165–66 (S.D.N.Y.1987); (finding that there "was substantially no difference between [the parole officer's] function and the protected function of a prosecutor who initiates a suits and brings evidence before a court" when the parole officer initiated the action against the parolee by executing a warrant and presented evidence to the hearing officer); *but see Smiley v. Davis,* No. 87 CIV 6047(MGC), 1988 WL 78306 (S.D.N.Y. July 14, 1988) (parole officer who filed parole revocation report is comparable to police officer deciding if there is probable cause and thus is not entitled to qualified immunity).

Even if Sullivan is entitled to only qualified immunity, however, we still find that she should be granted judgment as a matter of

---

**19.** Absent her pursuit of a parole warrant, Sullivan's act of filing the violation of release report with the Board of Parole would also be distinguishable from a police officer's submission of a sworn affidavit to a magistrate. *See* Martin A. Schwartz & John E. Kirklin, 1B *Section 1983 Litigation: Claims and Defenses* § 9.6, p. 236 (3d ed. 1997) ("The dissemination of information among parole board members is within the scope of absolute immunity, but the dissemination of information to other officials is protected by qualified immunity.") (citing *Anderson v. Boyd,* 714 F.2d 906 (9th Cir.1983)).

**20.** *Compare Mecham v. Taylor,* 117 F.3d 1428 (table), Nos. 96–4178, 96–4143, 1997 WL 375363 (10th Cir. July 8, 1997) (decisions of parole officers involving the revocation of parole, including preparation of a warrant request and parole violation report, warrant only qualified, not abso-

lute, immunity); *Wilson v. Kelkhoff,* 86 F.3d 1438 (7th Cir.1996) (parole officer's filing of parole violation report protected only by qualified immunity); *Jones v. Moore,* 986 F.2d 251 (8th Cir. 1993) (parole officer "not entitled to absolute immunity because a parole officer's issuance of a violation report is not akin to the activities of the parole board" which would be entitled to absolute immunity) *with MacNab v. Oregon Board of Parole,* 105 F.3d 665 (table), No. 95–35647, 1996 WL 742414 at *2, n. 4 (9th Cir. Dec.16, 1996) (citing *Demoran v. Witt,* 781 F.2d 155, 157 (9th Cir.1985) for the proposition that "parole officers are entitled to absolute immunity with respect to the preparation of parole revocation reports."); *Littles v. Board of Pardons and Paroles Division,* 68 F.3d 122, 123 (5th Cir.1995) ("Parole officers are entitled to absolute immunity from liability for their conduct in parole decisions and in the exercise of their decision-making powers.")

law.[21] Sullivan is entitled to qualified immunity insofar as her conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), or insofar as "it was objectively reasonable for [her] to believe that [her] acts did not violate those rights," *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir.1994).

■ When viewing all of the facts, we find no support for the jury's determination that Sullivan knew that the reports she filed against Taylor were false. In the violation of release report, Sullivan accused Taylor of violating his conditions of release by: (1) failing to make his office report on October 21, 1988, and (2) lying to Rogers when he stated that he could not report on October 21, 1988, because he was moving upstate immediately.

Taylor argues that although it was factually correct that he did not report on October 21, 1988, he had been excused from reporting by Rogers and therefore his excused failure to report did not violate his conditions of release. This charge was upheld at the probable cause hearing and in the Board's initial determination revoking Taylor's parole based on Sullivan's contention that Taylor had not been properly excused from, reporting since Taylor had not fully informed Rogers that Sullivan had specifically instructed him to report on October 21, 1988 for a special meeting. The Board found, "Charge 1 is sustained based upon the credible testimony of Senior Parole Officer Rogan and Parole Officer Sullivan. An assigned parole officer's partner under these circumstances cannot change reporting instructions under the circumstances given here, which the parolee knew about and Parole Officer Rogers did not."

There was a factual dispute regarding what exactly Taylor and Rogers had said to each other regarding Taylor's need to report on October 21, 1988. The Appeals Unit counsel recommended reversing the Board's finding on this charge because Rogers had failed to testify at the hearing. Without Rogers' testimony, the Appeals Unit counsel found there was insufficient evidence to sustain the charge since there was a dispute over the "exact nature and scope of the permission not to report."

Sullivan and Rogan believed Rogers' permission inadequate to excuse Taylor's failure to report. Taylor believed he had adequate permission not to report. Regardless of the actual permission given or the legal consequences of this permission, we find as a matter of law that Sullivan was objectively reasonable in her belief that this permission was inadequate to excuse Taylor from reporting. Even if she was ultimately incorrect, "mistaken judgments reasonably arrived at are protected [by qualified immunity]." *Rodriguez v. City of New York*, 72 F.3d 1051, 1065 (2d Cir.1995). *See Hunter v. Bryant*, 502 U.S. 224, 229, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") (citations omitted). We therefore find that Taylor's claim against Sullivan relating to the first charge must fail since, at the very least, Sullivan is entitled to qualified immunity for her filing of that charge.

■ The second charge, accusing Taylor of lying to Rogers regarding his reason for

---

**21.** Although the jury found that Sullivan was not entitled to qualified immunity, we now address whether Sullivan is entitled to qualified immunity as a matter of law. *See Defore v. Premore*, 86 F.3d 48, 50 (2d Cir.1996) ("qualified immunity is available as a matter of law when the undisputed facts establish that it was objectively reasonable for the defendants to believe that their actions did not violate clear established rights"); *compare Blissett v. Coughlin*, 66 F.3d 531, 538 (2d Cir.1995) ("the defense of qualified immunity may be presented to the jury or may be decided by the court in a motion for judgment as a matter of law") with *Warren v. Dwyer*, 906 F.2d 70, 76

(2d Cir.1990) ("The better rule, we believe, is for the court to decide the issue of qualified immunity as a matter of law, preferably on a pretrial motion for summary judgment when possible, or on a motion for a directed verdict. If there are unresolved factual issues which prevent an early disposition of the defense, the jury should decide these issues on special interrogatories. The ultimate legal determination whether, on the facts found, a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide."), *cert. denied*, 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990).

not wanting to report the next day, was dismissed by the Board since "there was insufficient evidence to show by a preponderance that the parolee lied to Parole Officer Rogers, who did not testify at the hearing." While the Board questioned whether Taylor had in fact lied to Rogers, there was no evidence presented at trial to support any doubt in this regard. Taylor originally testified that he told Rogers that he needed to move upstate because of a family emergency, and because his aunt was ill and he could not live with her anymore. On cross examination, however, Taylor admitted that the real reason he wanted to leave Mount Vernon was to get away from Sullivan since he feared she would act to revoke his parole. There is therefore no doubt that Taylor lied to Rogers regarding the reason for him wanting to move upstate.

There was also no evidence to impeach the sincerity of Sullivan's belief that Taylor had not moved upstate on October 21, 1988, but instead had spent the night at his aunt's house. Sullivan and Rogan testified that the now-deceased aunt had specifically told them this, and Taylor offered no evidence to contradict or even cast doubt upon this testimony.[22] Based upon all of the evidence, it is clear that Sullivan did not violate any of Taylor's rights by correctly accusing him of lying to Rogers. At the least, Sullivan was objectively reasonable in believing that Taylor had lied to Rogers. Sullivan is therefore entitled to qualified immunity for having filed these charges against Taylor.

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment as a matter of law on plaintiff's claim that she intentionally filed false reports against him is GRANTED. The clerk shall enter judgment in favor of defendant.

**SO ORDERED.**

---

**22.** Taylor also claimed that he was moving upstate in order to spare his ill aunt from being questioned regarding his activities. However, as the undisputed evidence showed, his aunt was not questioned by Sullivan and Rogan until after he left on October 21, 1988.