In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3097

TOBIN FOR GOVERNOR, JEAN L. BAKER,
RAYMOND A. DUBIEL, et al.,

Plaintiffs-Appellants,

v.

ILLINOIS STATE BOARD OF ELECTIONS,
and its members, individually and in
their official capacities, HANNELORE
HUISMAN, KENNETH R. BOYLE, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 2713--Robert W. Gettleman, Judge.

ARGUED MAY 7, 2001--DECIDED October 5, 2001


  Before FLAUM, Chief Judge, and RIPPLE and
DIANE P. WOOD, Circuit Judges.

  RIPPLE, Circuit Judge.  The plaintiffs in
this case are several Illinois residents
who signed a petition to place a slate of
candidates from the Libertarian Party of
Illinois ("LPI") on Illinois' general
election ballot in November 1998, and To
bin for Governor, a political committee
formed for the purpose of electing
Libertarian candidate James L. Tobin to
the governorship of Illinois
(collectively "Tobin for Governor").
Tobin for Governor brought this action
under 42 U.S.C. sec. 1983, and it alleged
that the Illinois State Board of
Elections ("ISBE" or "the Board") and its
individual members (collectively "the
defendants") violated the First and
Fourteenth Amendments by refusing to
certify and to place on the ballot the
LPI's slate of candidates. It sought com
pensatory damages and a declaration that
the ISBE's decision was null and
void./1 The defendants moved to dismiss
the complaint. The district court
dismissed the ISBE and the individual
members in their official capacities on
the ground of Eleventh Amendment
immunity. It also dismissed the claims

for damages against the board members in their individual capacities on the ground that they were entitled to quasi-judicial absolute immunity. Lastly, the district court dismissed the claim for declaratory relief as moot. Tobin for Governor now appeals. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

I

BACKGROUND

A.   Facts

Prior to the November 3, 1998, general election, the LPI submitted a nomination petition to the ISBE in an attempt to establish itself as a new, statewide political party. The nomination petition sought to certify the LPI's slate of candidates for statewide offices and to have those candidates' names listed on Illinois' general-election ballot. Over 60,600 signatures appeared on the nomination petition. On or about August 10, 1998, objections to the LPI's petition were filed. Hearings on the objections began on August 24, 1998, before a duly appointed hearing officer and continued intermittently throughout the summer and fall of 1998. On October 6, 1998, the hearing officer issued an opinion that sustained the objections in part but also determined that the petition had 26,610 valid signatures. Because a new political party only was required to submit 25,000 valid signatures in order to appear on the ballot, see 10 ILCS 5/10-2, the hearing officer concluded that the LPI's slate of candidates ought to be certified.

On October 12, 1998, the general counsel to the ISBE wrote an opinion letter to the board members in which he stated that he had "no reason to oppose any recommendation" in the hearing officer's decision and that the hearing officer had "correctly applied the applicable law." R.7 at A35. Nevertheless, on October 13, 1998, the Board struck an additional 4,285 signatures, which left only 22,325 valid signatures on the petition. Although the Board issued a written opinion, it did not explain the basis for its decision to strike these additional signatures. Once the Board struck the additional signatures, the number of

valid signatures remaining on the petition did not meet the statutory requirement of 25,000 signatures. Therefore, the Board refused to certify the LPI's slate of candidates, and those candidates were unable to appear on the general election ballot in November 1998.

B.  Earlier Proceedings

  1.  Related State Court Proceedings

  On October 23, 1998, the Libertarian candidates whose names did not appear on the ballot as a result of the Board's decision filed a petition for judicial review in the Circuit Court of Cook County. The court determined that it lacked jurisdiction for two reasons: (1) the LPI was a necessary party that had not been named and (2) the candidates did not serve the objectors or the LPI with a copy of the petition for judicial review within ten days of the Board's decision, as required by 10 ILCS 5/10-10.1. Thecircuit court therefore dismissed the candidates' petition. The Appellate Court of Illinois affirmed the circuit court's judgment, and the Supreme Court of Illinois denied the candidates' petition for leave to appeal.

  2.  Proceedings in the District Court

  On April 26, 1999, Tobin for Governor filed this action in federal district court against the ISBE and its members in their individual and official capacities. The complaint alleged that the ISBE's refusal to certify the LPI's slate of candidates violated Tobin for Governor's First Amendment rights to associate and to vote effectively and also violated the Equal Protection Clause of the Fourteenth Amendment. Tobin for Governor asked for money damages as well as for a declaratory judgment that the ISBE's decision was unconstitutional and void.

  The defendants moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The district court dismissed the ISBE and its members in their official capacities on the ground of Eleventh Amendment immunity./2 The court then dismissed Tobin for Governor's claims for monetary relief against the board members in their individual capacities because it

determined that the board members were entitled to quasi-judicial absolute immunity. The court found that the board members were acting in an adjudicative capacity when they evaluated the nomination petition and that the necessary safeguard of judicial review was available, thus making absolute immunity appropriate.

Lastly, the court held that Tobin for Governor's request for a declaration that the Board's decision was unconstitutional and void was moot because the election already had taken place by the time Tobin for Governor had filed suit. Following the district court's judgment, Tobin for Governor filed this appeal.

II

DISCUSSION

We review the district court's grant of a motion to dismiss de novo. See Crenshaw v. Baynerd, 180 F.3d 866, 868 (7th Cir.), cert. denied, 528 U.S. 952 (1999). We accept all of the well-pleaded factual allegations in the plaintiff's complaint as true and draw all reasonable inferences in favor of the plaintiff. See id. We shall affirm the district court's dismissal of the complaint only if it appears beyond doubt that the plaintiff cannot prove any set of facts that would entitle it to relief. See Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Crenshaw, 180 F.3d at 868.

Tobin for Governor argues that the district court erred in granting the board members absolute immunity. It also contends that its request for a declaratory judgment was not moot and that the district court erred in dismissing it on those grounds. We examine each of these arguments in turn.

A.  Absolute Immunity

1.

We must take a functional approach to determining whether absolute immunity is appropriate. See Forrester v. White, 484 U.S. 219, 224 (1988); Cleavinger v. Saxner, 474 U.S. 193, 201 (1985). Title or rank alone is an insufficient basis on which to confer absolute immunity; instead, whether absolute immunity ought

to be afforded must be determined by the nature of the responsibilities of the official in question. See Forrester, 484 U.S. at 224 ("[W]e examine the nature of the functions with which a particular official or class of officials has been lawfully entrusted, and we seek to evaluate the effect that exposure to particular forms of liability would likely have on the appropriate exercise of those functions."); Cleavinger, 474 U.S. at 201. Absolute immunity is available to members of quasi-judicial adjudicatory bodies when they perform duties that are functionally comparable to those of a judicial officer. See Butz v. Economou, 438 U.S. 478, 512-13 (1978); Crenshaw, 180 F.3d at 868. "[T]he nature of the adjudicative function requires a judge frequently to disappoint some of the most intense and ungovernable desires that people can have." Forrester, 484 U.S. at 226. Thus, the cloak of immunity is designed to prevent a situation in which decision-makers "act with an excess of caution or otherwise . . . skew their decisions in ways that result in less than full fidelity to the objective and independent criteria that ought to guide their conduct," id. at 223, out of a fear of litigation or personal monetary liability, see Crenshaw, 180 F.3d at 868.

"[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." Burns v. Reed, 500 U.S. 478, 486 (1991). Toward that end, the board members argue that they are entitled to absolute immunity because they were acting in an adjudicative capacity when they considered and ruled on the objections to the nomination petition. We agree.

Although the ISBE is charged with many diverse responsibilities with respect to the administration of elections, the Election Code of Illinois specifically gives it the statutory duty to "hear and pass upon objections to the nominations of candidates for State offices." 10 ILCS 5/10-9(1)./3 The statutory provision that governs the means by which the ISBE may evaluate petitions gives the ISBE many of the same powers as a court:

The electoral board shall have the power to administer oaths and to subpoena and examine witnesses and at the request of

either party the chairman may issue subpoenas requiring the attendance of witnesses and subpoenas duces tecum requiring the production of such books, papers, records and documents as may be evidence of any matter under inquiry before the electoral board, in the same manner as witnesses are subpoenaed in the Circuit Court.

10 ILCS 5/10-10. In this case, the method by which the petition and the objections to it were evaluated was remarkably like a trial. First, written objections to the petition were filed. A hearing on the objections was scheduled, and the parties were given notice of the hearing date. Both the objectors and the candidates were represented by attorneys at the hearing and were given the opportunity to present evidence in support of their cases. The hearing officer, who functioned much like a magistrate judge, evaluated the evidence and the arguments, considered their merits in light of the relevant law, and issued a recommendation. The Board then considered the hearing officer's recommendation and decided whether to accept it, just as a district court would do. In light of the nature of these proceedings, we believe it is an inescapable conclusion that the board members were acting in the functional capacity of judges when they ruled on the objections to the nomination petition.

Moreover, the conditions under which the board members must operate also support an award of absolute immunity. The Board's task of determining the validity of nomination petitions is likely to be controversial and to come under intense political scrutiny. To protect the integrity of the electoral process, it is necessary to protect the board members from harassment and intimidation so that they can exercise their independent judgment. See Cleavinger, 474 U.S. at 202 (listing "the need to assure that the individual can perform his functions without harassment or intimidation" as a factor to be considered in the absolute immunity analysis); see also Burns, 500 U.S. at 494 ("Absolute immunity is designed to free the judicial process from the harassment and intimidation associated with litigation." (emphasis in original)).

2.

Our conclusion that the board members are entitled to absolute immunity is supported by a line of cases in which we have awarded absolute immunity to members of state agencies operating in other contexts. For instance, we have granted the members of the Indiana Civil Rights Commission absolute immunity for their decision not to investigate a charge of discrimination; we determined that they were acting in an adjudicatory capacity when they concluded that they lacked jurisdiction to review and to consider the charge. See Crenshaw, 180 F.3d at 868. We have held that a local liquor control commissioner acted in a judicial capacity when he revoked a liquor license, which entitled him to absolute immunity. See Reed v. Village of Shorewood, 704 F.2d 943, 951-52 (7th Cir. 1983)./4 We also have granted absolute immunity to members of a prison review board who revoked a plaintiff's supervised release after they held ahearing to evaluate whether revocation was proper. See Wilson v. Kelkhoff, 86 F.3d 1438, 1443-45 (7th Cir. 1996). We held that the review board members were absolutely protected from suit for their failure (1) to provide the plaintiff sufficient notice of the hearing and (2) to allow the plaintiff to present evidence and witnesses. See id. at 1445.

Similarly, we have granted absolute immunity to state parole officials with respect to their decisions to grant, deny, or revoke parole, see, e.g., Trotter v. Klincar, 748 F.2d 1177, 1181-83 (7th Cir. 1984), and for their decision as to when to schedule a parole-revocation hearing, see Thompson v. Duke, 882 F.2d 1180, 1184 (7th Cir. 1989)./5 Our decision in Trotter was based in part on the fact that the parole officials' functions were "analogous to judicial action relating to the conduct of trial proceedings and to rulings on motions of counsel." Trotter, 748 F.2d at 1182. In addition, we have granted the Indiana attorney general absolute immunity when he acted in an adjudicatory function by determining whether to approve a contract under a statutory provision that required him to ensure the contract's legality. See Mother Goose Nursery Schs., Inc. v. Sendak, 770 F.2d 668, 670-75 (7th Cir. 1985)./6 With respect to the case

before us, we believe that the ISBE's conduct in evaluating the LPI's nomination petition falls within the heartland of what these cases have established as quasi-judicial adjudicatory functions.

3.

Nevertheless, Tobin for Governor maintains that an award of absolute immunity would not be appropriate in this case because (1) there is no common-law or historical basis for it; (2) this case is not an instance of vexatious litigation; (3) there is no effective check on the board members' potential abuse of authority; and (4) as political appointees of the major political parties, the board members are not sufficiently insulated from political pressures. We are unpersuaded by these arguments. We can dispose easily of the first two because they misapprehend the fundamental nature of quasi-judicial absolute immunity. Although Tobin for Governor correctly asserts that the ISBE is a statutory creation with no common-law history of immunity for its members, this assertion overlooks the fact that the board members function in a capacity equivalent to that of judges, and judges have an extensive common-law history of enjoying absolute immunity for their judicial acts. See, e.g., Cleavinger, 474 U.S. at 199-200 (discussing the common-law history of judicial immunity and stating that "'[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction'" (quoting Pierson v. Ray, 386 U.S. 547, 553-54 (1967))).Indeed, the Supreme Court itself has granted absolute immunity to administrative law judges, whose positions also are statutory creations. See Butz, 438 U.S. at 514.

Tobin for Governor's second contention--that its case is not an instance of vexatious litigation--does not properly take account of the scope of an award of absolute immunity. As we already have indicated, absolute immunity is available to quasi-judicial officers because the threat of being subjected to any litigation impedes the officers' ability to engage in independent and fearless decision-making. The possibility of a

case-by-case exception that would permit non-vexatious suits to proceed would destroy the protection that absolute immunity provides to the judicial process. Even if Tobin for Governor's suit is meritorious-- and therefore not vexatious--it cannot pierce the shield of absolute immunity because judicial officers are entitled to that immunity even when they act in error, maliciously, or in excess of their authority. See, e.g., Stump v. Sparkman, 435 U.S. 349, 356 & 359 (1978) ("A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors.").

In light of the structure of the Illinois election code, we also are unable to accept Tobin for Governor's assertion that there are no effective checks on the board members' potential abuse of authority. Quite to the contrary, Illinois' election code specifically provides for judicial review of the Board's decision in the state circuit courts. See 10 ILCS 5/10-10.1;/7 see also Cleavinger, 474 U.S. at 202 (listing "the correctability of error on appeal" as one factor that favors a grant of absolute immunity). Tobin for Governor suggests that the board members have an incentive to delay their decision until it will be virtually impossible to obtain review before the election, and it points to the Libertarian candidates' attempt to obtain judicial review following the Board's decision in this case as support for its contention. However, the LPI candidates were unsuccessful in obtaining review because they did not follow the procedural requirements of the election code, not because the Board unduly and purposefully delayed its decision. Not only did the Libertarian candidates fail to comply with the time requirements of the election code, but they failed to name the LPI as a necessary party and thereby deprived the circuit court of jurisdiction. Had the candidates complied with the statute's terms, they would have obtained review.

Moreover, the election code contains provisions that help guard against the kind of stonewalling that Tobin for Governor anticipates. Nomination petitions must be filed approximately

three months prior to the election. See 10 ILCS 5/10-6. Any objections to the nomination petitions must be made in writing within five business days after the last day for filing the nomination petition. See 10 ILCS 5/10-8. Within twenty-four hours of receiving the objections, the chairman of ISBE must notify the candidates whose petitions were objected to that the ISBE is required to meet and pass upon the validity of the petitions, and he must give them notice of the date and time of the hearing. See 10 ILCS 5/10-10. The ISBE must hold its hearing not less than three nor more than five days from the time it received the objections. See id. Within ten days of the Board's certification decision, the candidate must file a petition for judicial review in the circuit court. See 10 ILCS 5/10-10.1. Once a candidate has filed a petition for judicial review, the court must hold a hearing on the petition within thirty days of the filing, and the court is directed by statute to reach a decision "promptly after such hearing." Id. These statutory provisions should allow candidates to obtain judicial review prior to the election. If, however, the Board does not issue its decision in sufficient time for the candidate to pursue the normal avenues of judicial review prior to the election, the candidate may seek a writ of mandamus in the Supreme Court of Illinois. See Dooley v. McGillicudy, 345 N.E.2d 102, 104 (Ill. 1976) ("'In cases involving the election process, where the time factor alone would usually render an appeal futile, this court has seen fit to grant original writs of mandamus.'" (emphasis in original) (quoting People ex rel. Meyer v. Kerner, 219 N.E.2d 617, 619 (1966))). In light of these various methods of ensuring judicial review prior to the election, we do not believe that the candidates' inability to obtain review of the Board's decision here--an inability that resulted from their own procedural mistakes--is a proper basis on which to deny the board members absolute immunity.

Lastly, we are unwilling to accept Tobin for Governor's unsupported allegation that the board members will not treat minority-party and independent candidates fairly because the members have too great a stake in advancing the interests of the

major political parties to which they belong./8 Although the board members are appointed to the ISBE by the governor, whose decision may include political considerations, "political or electoral pressure alone cannot deprive government officials of absolute immunity." Brown v. Griesenauer, 970 F.2d 431, 439 (8th Cir. 1992). As the Eighth Circuit has pointed out, if the rule were otherwise, state judges who are elected would not be entitled to absolute immunity. See id. Instead, "for purposes of immunity analysis, the insulation-from-political-influence factor does not refer to the independence of the government official from the political or electoral process, but . . . to the independence of the government official as a decision-maker." Id.

There are several provisions in the Illinois election code that insulate the board members from political influences and that protect their independence as decision-makers. Although the board members are appointed by the governor, they serve for a term of years, not at the pleasure of the governor. See 10 ILCS 5/1A-3.1. Perhaps more importantly, the board members may not "engage in any partisan political activity whatsoever;" may not contribute to political parties, candidates, or organizations financially or through services; and may not "become a candidate for nomination for, or election to, or accept appointment to any public office" so long as they hold their position on the ISBE. 10 ILCS 5/1A-13. These provisions help insulate the board members' decision-making process from political influences, which weighs in favor of granting absolute immunity. See Cleavinger, 474 U.S. at 202 (listing "insulation from political influence" as a factor that can support an award of absolute immunity). We simply are unwilling to assume that the board members cannot be impartial because they retain their own party affiliation.

In conclusion, the board members act in the functional capacity of judges when they rule on the validity of nomination petitions, which entitles them to quasi-judicial absolute immunity. Tobin for Governor's arguments do not persuade us that the result should be otherwise./9 Consequently, the district court correctly dismissed the claims for

monetary relief against the board members in their individual capacities.

## B. Justiciability

Tobin for Governor maintains that the district court erred in dismissing as moot its request for a declaratory judgment that the Board's decision to deny the LPI access to the ballot was unconstitutional and void. In Tobin for Governor's view, the Board's written decision did not comply with the election code because it did not state which objections to the nomination petition it sustained, and this problem is capable of repetition and yet will evade review. The defendants respond that Tobin for Governor does not have standing to bring this claim because (1) its injury is derivative of the LPI's and the candidates' inability to obtain ballot access and (2) it is speculative to assume that Tobin for Governor will be injured the same way in the future.

"It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983). "Justiciability concerns not only the standing of litigants to assert particular claims, but also the appropriate timing of judicial intervention." Renne v. Geary, 501 U.S. 312, 320 (1991). Tobin for Governor's claim for declaratory relief is nonjusticiable on two grounds: Tobin for Governor lacks standing to bring this claim, and the claim is now moot.

### 1. Standing

To establish standing, a plaintiff must show (1) injury in fact, meaning an invasion of a legally protected interest that is concrete and particularized, actual or imminent, and not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of such that the injury is fairly traceable to the defendant's actions; and (3) that a favorable decision is likely to redress the injury. See Lujan v. Defenders of Wildlife, 504

U.S. 555, 560-61 (1992); Sierakowski v. Ryan, 223 F.3d 440, 442-43 (7th Cir. 2000). With respect to the injury in fact requirement, the plaintiff must establish that he has sustained or is immediately in danger of sustaining some direct injury. See Lyons, 461 U.S. at 101-02; Sierakowski, 223 F.3d at 443. "Abstract injury is not enough." Lyons, 461 U.S. at 101. Moreover, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy" regarding prospective equitable relief. O'Shea v. Littleton, 414 U.S. 488, 495 (1974). A plaintiff's speculation that he may suffer the same injury at some time in the future is insufficient to establish standing. See Lyons, 461 U.S. at 105; Sierakowski, 223 F.3d at 444.

Tobin for Governor's assertion that it is likely to be injured in the future in the same way it was injured in this case is purely speculative. The gravamen of Tobin for Governor's complaint is that the Board committed serious procedural errors in refusing to certify the LPI's slate of candidates, that those errors infringed on Tobin for Governor's constitutional rights, and that the Board is likely to make the same procedural errors in the future. However, Tobin for Governor cannot demonstrate a "realistic threat" that it will be subject to the same procedural errors in the future. Perry v. Sheahan, 222 F.3d 309, 313 (7th Cir. 2000). In order for Tobin for Governor to be subject to the same injuries it claims to have suffered in the last election, several contingencies would have to occur during the next election. Jim Tobin and the other Libertarian candidates would have to decide to run for state office, they would have to collect over 25,000 signatures, they would need to submit those signatures to the Board, a hearing officer would need to determine that those signatures were sufficient, the Board then would have to override the hearing officer's determination, and the Board would have to issue a written opinion that did not describe precisely the objections that it sustained. We have no basis on which to conclude that each of these contingencies will recur during the next election. Although past wrongs "may be evidence that future violations are likely to occur[,] . . . in this case the allegations regarding past conduct

still leave us with bare speculation" about what will occur during the next election. Sierakowski, 223 F.3d at 445 (internal citations omitted). Consequently, Tobin for Governor has failed to establish that it has "the requisite personal stake in the outcome of this litigation to establish standing" to seek declaratory relief. Id. at 444.

2. Mootness

Tobin for Governor's claim for declaratory relief also is nonjusticiable because it is moot. A case is moot when it no longer presents a live case or controversy. See Bd. of Ed. of Downers Grove Grade Sch. Dist. No. 58 v. Steven L., 89 F.3d 464, 467 (7th Cir. 1996). The November 1998 election had come and gone by the time Tobin for Governor filed its action in the district court. Thus, the relief that Tobin for Governor requested--a declaration that the Board's decision was unconstitutional and void--would have no impact on the parties to this suit or on the results of the November 1998 election. We are well aware that the passage of an election does not necessarily render an election-related challenge moot and that such challenges may fall within the "capable of repetition yet evading review" exception to the mootness doctrine. See Moore v. Ogilvie, 394 U.S. 814, 816 (1969); Stewart v. Taylor, 104 F.3d 965, 969 (7th Cir. 1997). This, however, is not such a case. The cases that traditionally have fallen within the "capable of repetition" exception have involved challenges to the validity of statutory provisions that will continue to operate past the election in question and that will burden future candidates in future elections./10 In those circumstances, the challenge reflects a "continuing controversy," see Moore, 394 U.S. at 816, and "[t]he construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated before an election is held," Storer v. Brown, 415 U.S. 724, 737 n.8 (1974). Tobin for Governor's challenge, however, is not to any statutory provision that will continue to operate past the November

1998 election. Instead, Tobin for Governor challenges the particular procedures by which the Board issued its decision in the past election. Because the Board's ruling on the LPI's 1998 nomination petition--and hence its alleged procedural oversights--was a one-time decision, we are unable to conclude that the issues Tobin for Governor has raised with respect to that decision are of a continuing nature.

Moreover, the "capable of repetition" exception applies only when (1) the challenged action is too short in duration to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again. See Il. State Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 187 (1979) (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975)). Neither of these conditions is satisfied in this case. First, a controversy of this sort does not necessarily evade review. As we already have discussed, judicial review of the Board's decision is available by statute if the proper procedural steps are followed, and the state courts to which that review is directed can order a new election if the case is not fully litigated prior to election day. It was only the Libertarian candidates' procedural missteps that prevented judicial review of the Board's decision here, which we believe is insufficient to bring this case within the "evading review" requirement of the exception.

Further, we do not believe that there is a reasonable expectation that Tobin for Governor will find itself in this same situation in the future. As we discussed with respect to the standing inquiry, numerous contingencies would need to occur before Tobin for Governor would find itself subjected to these same injuries again. Because we believe it is pure speculation that these contingencies all will reoccur, the "capable of repetition" exception to the mootness doctrine does not apply.

Tobin for Governor does not have standing to pursue its claim for declaratory relief nor does it present the court with a live case or controversy. Therefore, the district

court did not err in dismissing Tobin for
Governor's claim for declaratory relief.

Conclusion

   Tobin for Governor may not sue the
members of the ISBE in their individual
capacities because they are entitled to
quasi-judicial absolute immunity. Tobin
for Governor's claim for declaratory
relief is nonjusticiable because Tobin
for Governor lacks standing and because
the claim is moot. We therefore affirm
the judgment of the district court.

AFFIRMED

FOOTNOTES
/1 Tobin for Governor also sought a declaration that
10 ILCS 5/10-4 was unconstitutional insofar as it
required petition circulators to be registered
voters. The district court held that the chal-
lenged portion of Illinois' election code was
unconstitutional, and the defendants initially
cross-appealed that judgment. However, we held a
similar provision of Illinois' election code
unconstitutional in Krislov v. Rednour, 226 F.3d
851, 858-66 (7th Cir. 2000), cert. denied, 121 S.
Ct. 1085 (2001) (holding 10 ILCS 5/7-10 unconsti-
tutional). Following the Supreme Court's denial
of certiorari in Krislov, the defendants volun-
tarily dismissed their cross-appeal. Therefore,
we need not discuss this issue further.

/2 Tobin for Governor does not appeal this aspect of
the district court's judgment.

/3 The election code requires the ISBE to "take up
the question[s] as to whether or not" the nomina-
tion petitions "are in proper form, and whether
or not they were filed within the time and under
the conditions required by law." 10 ILCS 5/10-10.
The ISBE also must decide whether the objections
to the nomination petitions ought to be sus-
tained. See id.

/4 Other circuits, as well, have granted members of
professional licensing boards absolute immunity
for their actions during disciplinary proceed-
ings. See, e.g., Beck v. Tex. State Bd. of Dental
Exam'rs, 204 F.3d 629, 633-36 (5th Cir.) (grant-
ing absolute immunity to members of the Texas
State Board of Dental Examiners for their deci-
sion to revoke the plaintiff's license to prac-
tice dentistry), cert. denied, 531 U.S. 871
(2000); Mishler v. Clift, 191 F.3d 998, 1004-08
(9th Cir. 1999) (collecting cases) (holding that
the Nevada Board of Medical Examiners was enti-
tled to absolute immunity for acts occurring
during the disciplinary hearing process, includ

ing holding hearings, taking evidence, and adjudicating the dispute); Romano v. Bible, 169 F.3d 1182, 1187 (9th Cir.) (granting absolute immunity to members of the Nevada Gaming Commission for their actions in approving a stipulation that the plaintiff entered into with a gaming board to resolve a disciplinary proceeding), cert. denied, 528 U.S. 816 (1999); Watts v. Burkhart, 978 F.2d 269, 272-78 (6th Cir. 1992) (granting members of the Tennessee Board of Medical Examiners absolute immunity for the decision they reached during a summary suspension hearing).

/5 See also Walrath v. United States, 35 F.3d 277, 280-84 (7th Cir. 1994) (granting absolute immunity to members of a federal parole board for their decision to revoke parole).

/6 Similarly, the Eighth Circuit has granted absolute immunity to a board of aldermen who conducted impeachment proceedings against the mayor because those proceedings required the aldermen to function "like judges in that they were required to determine whether bias existed, to hear testimony and receive evidence, to evaluate the credibility of witnesses and weigh the evidence, and to make findings of fact and conclusions of law." Brown v. Griesenauer, 970 F.2d 431, 437 (8th Cir. 1992). The court also explained that a "'judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist.'" Id. (quoting Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226 (1908)).

/7 10 ILCS 5/10-10.1 reads in relevant part:

[A] candidate or objector aggrieved by the decision of an electoral board may secure judicial review of such decision in the circuit court of the county in which the hearing of the electoral board was held. The party seeking review must file a petition with the clerk of the court within 10 days after the decision of the electoral board. The petition shall contain a brief statement of the reasons why the decision of the board should be reversed. The petitioner shall serve a copy of the petition upon the electoral board and other parties to the proceeding . . . .

The court shall set the matter for hearing to be held within 30 days after the filing of the petition and shall make its decision promptly after such hearing.

/8 We believe it is important to note that Tobin for Governor's argument is premised on the faulty assumption that the board members always will belong to either the Republican or Democratic parties. The appointment provisions of the elec-

tion code in no way compel that result. Of the eight board members, four will be affiliated with the same political party as the governor, and four will be affiliated with the political party whose nominee for governor in the most recent election received the second highest number of votes. See 10 ILCS 5/1A-2. Although as a practical matter the composition of the Board is likely to consist primarily of Republicans and Democrats, it is at least possible that other parties will obtain representation on the Board. Therefore, we cannot base our analysis on the assumption that only Republicans and Democrats will serve on the Board. Tobin for Governor's argument further assumes that the political "outs" will never find friends among the political "ins," which is an assumption that may not be realistic.

/9 In two cases, the Ninth Circuit has been asked to determine whether the members of an election board enjoyed qualified immunity. See Charfauros v. Bd. of Elections, 249 F.3d 941, 951-56 (9th Cir. 2001) (holding that a territorial board of elections could not claim qualified immunity when the board had implemented and applied new and discriminatory procedures to determine whether certain individuals, whose eligibility had been challenged, were entitled to vote); Oakley v. Pasadena, 535 F.2d 503, 504-05 (9th Cir. 1976) (holding in a pre-Butz case that the city board members had qualified immunity for denying a candidate a place on the ballot after a police report indicated that the candidate was not a resident of the city). In these cases it does not appear that the court was asked to determine whether the board members were entitled to absolute immunity. Nor can we be certain that the procedural contexts in those cases placed the board in an analogous decision-making context to the one of the ISBE in this case. Several district court cases also deal with whether members of an election board are eligible for qualified immunity. See McLaughlin v. City of Canton, 947 F. Supp. 954, 966-68 (S.D. Miss. 1995); Hirschfeld v. Spanakos, 909 F. Supp. 174, 177-80 (S.D.N.Y. 1995), rev'd on other grounds, 104 F.3d 16 (2d Cir. 1997); Pestrak v. Ohio Elections Comm'n, 670 F. Supp. 1368, 1372 (S.D. Ohio 1987), rev'd in part on other grounds, 926 F.2d 523 (6th Cir. 1991); Kilgore v. McClelland, 637 F. Supp. 1241, 1246-47 (W.D. Va. 1986); De la Cruz v. Dufresne, 533 F. Supp. 145, 149-50 (D. Nev. 1982). However, these cases do not indicate that the issue of absolute immunity ever was submitted to the court. Nor do these cases arise in procedural contexts sufficiently close to the case before us to offer any persuasive guidance.

/10 See Norman v. Reed, 502 U.S. 279, 287-88 (1992) (holding that candidates' constitutional chal-

lenge to two provisions of Illinois' election code was not moot once the election was over because there was every reason to suspect that the parties would bring the same challenge to the same provisions in the future); Storer v. Brown, 415 U.S. 724, 737 n.8 (1974) (holding that constitutional challenges to the provisions of California's election code that required candidates to be politically disaffiliated for at least one year and to file nomination petitions that satisfied stringent signature requirements were not moot once the election was "long over" because the effects of the statutes would "persist as [they were] applied in future elections"); Moore v. Ogilvie, 394 U.S. 814, 816 (1969) (holding that candidates' challenge to a statutory signature requirement was not moot once the election had been held because the burden "placed on the nomination of candidates for statewide offices remain[ed] and control[led] future elections"); Stewart v. Taylor, 104 F.3d 965, 969-70 (7th Cir. 1997) (holding that candidate's constitutional challenge to Indiana's anti-fusion law was not moot once the election had passed because the same challenge could be raised to the same statute during the next election).